NO. 25-2121(L)

# United States Court of Appeals

*for the*

# Fourth Circuit

MICHAEL JACKSON, on behalf of himself and all others similarly situated,

*Plaintiff-Appellant,*

– v. –

THOMSON REUTERS AMERICA CORPORATION,

*Defendant-Appellee.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF WEST VIRGINIA AT CLARKSBURG

## OPENING BRIEF FOR PLAINTIFF-APPELLANT


PHILIP LAWRENCE FRAIETTA
BURSOR & FISHER, P.A.
50 Main Street, Suite 475
White Plains, New York 10606
(914) 874-0708
pfraietta@bursor.com
*Counsel for Plaintiff-Appellant*

– and –

JASON EDWARD CAUSEY
KATZ, KANTOR, STONESTREET & BUCKNER PLLC
206 South Walker Street, Suite 475
Princeton, West Virginia 24740
(914) 874-0708
jcausey@kksblaw.com
*Counsel for Plaintiff-Appellant*

JULIAN COLE DIAMOND
BURSOR & FISHER, P.A.
1330 Avenue of the Americas, 32nd Floor
New York, New York 10019
(646) 837-7150
jdiamond@bursor.com
*Counsel for Plaintiff-Appellant*



COUNSEL PRESS (800) 4-APPEAL • (387193)

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

## DISCLOSURE STATEMENT

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. 25-2121 Caption: Michael Jackson v. Thomson Reuters

Pursuant to FRAP 26.1 and Local Rule 26.1,

Michael Jackson
(name of party/amicus)

who is Appellant, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1. Is party/amicus a publicly held corporation or other publicly held entity? ☐ YES ☑ NO

2. Does party/amicus have any parent corporations? ☐ YES ☑ NO
If yes, identify all parent corporations, including all generations of parent corporations:

3. Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity? ☐ YES ☑ NO
If yes, identify all such owners:

4. Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation? ☐YES ☑NO
If yes, identify entity and nature of interest:

5. Is party a trade association? (amici curiae do not complete this question) ☐YES ☑NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6. Does this case arise out of a bankruptcy proceeding? ☐YES ☑NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7. Is this a criminal case in which there was an organizational victim? ☐YES ☑NO
If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Jason E. Causey Date: 10/15/25

Counsel for: Appellant - Michael Jackson



Print to PDF for Filing

## TABLE OF CONTENTS

**PAGE(S)**


JURISDICTIONAL STATEMENT ..........1
STATEMENT OF THE ISSUES PRESENTED FOR REVIEW ..........2
STATEMENT OF THE CASE..........2
A. Statement of Facts ..........2
B. Procedural History..........5
SUMMARY OF THE ARGUMENT ..........7
ARGUMENT..........8
I. STANDARD OF REVIEW..........8
II. DANIEL'S LAW IS NOT SUBJECT TO STRICT SCRUTINY..........11
A. The Data at Issue Is Not Speech..........11
B. Daniel's Law Is Not Content-Based ..........13
C. Statutes Recognizing Privacy Torts Are Not Subject to Strict Scrutiny, Regardless of Whether They Are Content Based..........15
1. Privacy Torts, Like Daniel's Law, Are Not Subject to Strict Scrutiny ..........17
2. History and Tradition Show Daniel's Law Isn't Subject to Strict Scrutiny ..........21
D. Daniel's Law Has No Nexus with Viewpoint Discrimination..........26
E. At Most, Daniel's Law Regulates Commercial Speech..........30
III. DANIEL'S LAW SATISFIES ANY STANDARD OF REVIEW..........36
A. Privacy Laws Have Repeatedly Survived First Amendment Challenges ..........36
B. Daniel's Law Is Neither "Overinclusive" Nor "Overbroad" ..........37
1. The Absence of a Notice Requirement Does Not Render the Statute Overinclusive ..........37
2. The Absence of a Knowledge Requirement Does Not Render the Statute Overinclusive..........42
C. Daniel's Law Is Not Underinclusive..........46
IV. DEFENDANTS-APPELLEES' FACIAL VAGUENESS CHALLENGE IS MERITLESS..........51
V. REGARDLESS, DANIEL'S LAW MEETS THE STRICT SCRUTINY TEST BECAUSE EVEN DEFENDANTS-APPELLEES DO NOT DISPUTE THAT IT PROTECTS AGAINST THE OCCUPATIONAL HAZARDS FACED BY COVERED PERSONS..........54
CONCLUSION..........55
REQUEST FOR ORAL ARGUMENT ..........55

## TABLE OF AUTHORITIES

**PAGE(S)**

**CASES**

*Am. Fed'n of Gov't Emps., AFL-CIO, Loc. 1923 v. U.S., Dep't of Health & Hum. Servs.*,
712 F.2d 931 (4th Cir. 1983)........................................................................ 20

*Americans for Prosperity Foundation v. Bonta*,
594 U.S. 595 (2021)........................................................................ 10, 11, 37

*Atlas Data Priv. Corp. v. We Inform, LLC*,
758 F. Supp. 3d 322 (D.N.J. Nov. 26, 2024)...............................................Passim

*Barr v. Am. Ass'n of Political Consultants*,
591 U.S. 610 (2020)........................................................................ 36

*Bartnicki v. Vopper*,
532 U.S. 514 (2001)........................................................................ 19

*Bd. of Trustees of State Univ. of N.Y. v. Fox*,
492 U.S. 469 (1989)........................................................................ 32

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)........................................................................ 8

*Berger v. City of Seattle*,
569 F.3d 1029 (9th Cir. 2009)........................................................................ 41

*Boelter v. Hearst Commc'ns, Inc.*,
192 F. Supp. 3d 427 (S.D.N.Y. 2016)........................................................................ 36

*Bolger v. Youngs Drug Prod. Corp.*,
463 U.S. 60 (1983)........................................................................ 31

*Brayshaw v. City of Tallahassee*,
709 F.Supp.2d 1244 (N.D. Fla. 2010)........................................................................ 15

*Brooks v. Thomson Reuters Corp.*,
2021 WL 3621837 (N.D. Cal. Aug. 16, 2021)........................................................................ 35

*Burson v. Freeman*,
504 U.S. 191 (1992) ........................................................................................ 20

*Camacho v. Control Grp. Media Co., LLC*,
2022 WL 3093306 (S.D. Cal. July 18, 2022) ......................................... 24, 33-34

*Capra v. Thoroughbred Racing Ass'n of N. Am., Inc.*,
787 F.2d 463 (9th Cir. 1986)......................................................................... 24, 54

*Cent. Hudson Gas and Elec. Corp. v. Public Serv. Comm'n of New York*,
447 U.S. 557 (1980) ........................................................................................ 30

*Chicago v. Morales*,
527 U.S. 41 (1999) .......................................................................................... 11

*Christopherson v. Cinema Entertainment Corp.*,
2024 WL 1120925 (D. Minn. Mar. 6, 2024) ..................................................... 36

*Citizens for Health v. Leavitt*,
428 F.3d 167 (3d Cir. 2005)............................................................................ 36

*City of Austin v. Reagan Nat'l Advertising of Austin, LLC*,
596 U.S. 61 (2022) .................................................................. 13, 14, 15, 21

*Clark v. Community for Creative Non-Violence*,
468 U.S. 288 (1984) ..................................................................................... 11-12

*Cottrill v. Ranson*,
200 W. Va. 691 (W. Va. 1997) ........................................................................ 43

*Counterman v. Colorado*,
600 U.S. 66 (2023) .......................................................................................... 55

*Cox Broadcasting Corp. v. Cohn*,
420 U.S. 469 (1975) ........................................................................................ 19

*Crump v. Beckley Newspapers, Inc.*,
173 W. Va. 699 (1983)..................................................................................... 16

*Davenport v. Washington Educ. Ass'n*,
551 U.S. 177 (2007) ........................................................................... 27, 28, 29

*Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*,
472 U.S. 749 (1985) ........ 28, 34, 35, 36

*Educational Media Co. v. Insley*,
731 F.3d 291 (4th Cir. 2013) ........ 9

*Erie R.R. Co. v. Tompkins*,
304 U.S. 64 (1938) ........ 43

*F.C.C. v. Pacifica Found.*,
438 U.S. 726 (1978) ........ 40, 41

*Farley v. Worley*,
215 W.Va. 412 (2004) ........ 42

*Florida Star v. B.J.F.*,
491 U.S. 524 (1989) ........ 18, 19

*Frisby v. Schultz*,
487 U.S. 474 (1988) ........ 41

*Fusaro v. Howard*,
19 F.4th 357 (4th Cir. 2021) ........ 8

*Gregory v. City of Chicago*,
394 U.S. 111 (1969) ........ 40

*Haislop v. Edgell*,
215 W. Va. 88 (W. Va. 2003) ........ 48

*Handsome Brook Farm, LLC v. Humane Farm Animal Care, Inc.*,
700 F. App'x 251 (4th Cir. 2017) ........ 32, 33

*Hart v. Electronic Arts, Inc.*,
717 F.3d 141 (3d Cir. 2013) ........ 20

*Hebb v. City of Asheville, N. Carolina*,
145 F.4th 421 (4th Cir. 2025) ........ 8

*Hechler v. Casey*,
175 W. Va. 434 (1985) ........ 48

*Hill v. Colorado*,
530 U.S. 703 (2000) ........ 41, 54, 55

*Hines v. Pardue*,
117 F.4th 769 (5th Cir. 2024) ........ 26

*Holder v. Humanitarian Law Project*,
561 U.S. 1 (2010) ........ 52, 53

*Hyde v. City of Columbia*,
637 S.W.2d 251 (Mo. Ct. App. 1982) ........ 24, 54

*Iancu v. Brunetti*,
588 U.S. 388 (2019) ........ 26

*IMDb.com Inc. v. Becerra*,
962 F.3d 1111 (9th Cir. 2020) ........ 14

*In re Allen*,
119 F.3d 1129 (4th Cir. 1997) ........ 49

*In re Charleston Gazette FOIA Request*,
222 W. Va. 771 (2008) ........ 42

*Kellman v. Spokeo, Inc.*,
599 F. Supp. 3d 877 (N.D. Cal. 2022) ........ 20, 36

*King v. Gen. Info. Servs, Inc.*,
903 F. Supp. 2d 303 (E.D. Pa. 2012) ........ 36

*Kolebuck-Utz v. Whitepages Inc.*,
2021 WL 1575219 (W.D. Wash. Apr. 22, 2021) ........ 24, 33

*Kovacs v. Cooper*,
336 U.S. 77 (1949) ........ 41

*Krakauer v. Dish Network, L.L.C.*,
925 F.3d 643 (4th Cir. 2019) ........ 17

*Kratovil v. City of New Brunswick*,
261 N.J. 1 (N.J. June 17, 2025) ........ 5, 28, 33

*Kratovil v. City of New Brunswick*,
2024 WL 1826867 (N.J. App. Div. Apr. 26, 2024) .......................................... 5, 28

*Krause v. Rocketreach*,
561 F. Supp. 3d 778 (N.D. Ill. 2021) ........................................................... 24, 36

*Lehman v. City of Shaker Heights*,
418 U.S. 298 (1974) ........................................................................................ 41

*Maryland Shall Issue, Inc. v. Anne Arundel Cnty. Maryland*,
91 F.4th 238 (4th Cir. 2024) .................................................................. 30, 31, 34

*Nat'l Coal. of Prayer, Inc. v. Carter*,
455 F.3d 783 (7th Cir. 2006)............................................................................ 36

*Nat'l Pub. Radio, Inc. v. Klavans*,
560 F. Supp. 3d 916 (D. Md. 2021) ................................................................... 9

*Nat'l Rifle Ass'n of Am. v. Vullo*,
602 U.S. 175 (2024) ........................................................................................ 26

*Nixon v. Administrator of Gen. Servs.*,
433 U.S. 425 (1977) ........................................................................................ 20

*Ostergren v. Cuccinelli*,
615 F.3d 263 (4th Cir. 2010)............................................................................ 14

*Ostergren v. McDonnell*,
2008 WL 3895593 (E.D. Va. Aug. 22, 2008)..................................................... 18

*Pac. Gas & Elec. Co. v. Pub. Utilities Comm'n of California*,
475 U.S. 1 (1986) ............................................................................................ 32

*Pavesich v. New England Life Ins. Co.*,
50 S.E. 68 (Ga. 1905)................................................................................. 22, 23

*People v. Martinez*,
534 P.3d 72 (Cal. 2023) ................................................................................... 34

*Publius v. Boyer-Vine*,
237 F.Supp.3d 997 (E.D. Cal. 2017)................................................................. 14

*Reed v. Town of Gilbert, Ariz.*,
576 U.S. 155 (2015) ........................................................ 13, 14, 26, 27

*Rice v. Paladin Enterprises, Inc.*,
128 F.3d 233 (4th Cir. 1997) ........................................................ 20

*Riley v. Nat'l Fed. of the Blind of N.C., Inc.*,
487 U.S. 781 (1988) ........................................................ 32, 33

*Rosenberger v. Rector & Visitors of Univ. of Va.*,
515 U.S. 819 (1995) ........................................................ 26

*Rumsfeld v. Forum for Academic and Institutional Rights, Inc.*,
547 US. 47 (2006) ........................................................ 12

*Sabri v. United States*,
541 U.S. 600 (2004) ........................................................ 10

*Saunders v. Hearst Television, Inc.*,
711 F. Supp. 3d 24 (D. Mass. 2024) ........................................................ 35, 36

*Sheehan v. Gregoire*,
272 F.Supp.2d 1135 (W.D. Wash. 2003) ........................................................ 14

*Shook v. City of Lincolnton*,
2019 WL 4145709 (W.D.N.C. Aug. 29, 2019) ........................................................ 52

*Snyder v. Phelps*,
562 U.S. 443 (2011) ........................................................ 24

*Sorrell v. IMS Health Inc.*,
564 U.S. 552 (2011) ........................................................ 14

*Spence v. State of Wash.*,
418 U.S. 405 (1974) ........................................................ 12

*State v. VanBuren*,
214 A.3d 791 (Vt. 2019) ........................................................ 21, 44

*Texas v. Johnson*,
491 U.S. 397, (1989) ........................................................ 12

*Time, Inc. v. Hill*,
385 U.S. 374 (1967) .......... 18-19

*Trans Union Corp v. F.T.C.*,
267 F.3d 1138 (2001) .......... 25, 29, 30

*Troster v. Pennsylvania State Dept. of Corrections*,
65 F.3d 1086 (3d. Cir. 1995) .......... 12

*U.S. West, Inc. v. F.C.C.*,
182 F.3d 1224 (10th Cir. 1999) .......... 31

*United States Dep't of Justice v. Reporters Committee for Freedom of the Press*,
489 U.S. 749 (1989) .......... 25

*United States v. Anderson*,
700 F. App'x 190 (4th Cir. 2017) .......... 42

*United States v. Browning*,
109 F. App'x 542 (4th Cir. 2004) .......... 8

*United States v. Fulks*,
454 F.3d 410 (4th Cir. 2006) .......... 8

*United States v. Hansen*,
599 U.S. 762 (2023) .......... 10

*United States v. Hosford*,
843 F.3d 161 (4th Cir. 2016) .......... 9

*United States v. Rahimi*,
144 U.S. 1889, 1898 (2024) .......... 9, 10

*United States v. Salerno*,
481 U.S. 739 (1987) .......... 9

*United States v. Shrader*,
675 F.3d 300 (4th Cir. 2012) .......... 42

*United States v. Williams*,
364 F.3d 556 (4th Cir. 2004) .......... 8

*United States v. Williams*,
553 U.S. 285 (2008) .......... 52

*United States v. Yengel*,
711 F.3d 392 (4th Cir. 2013) .......... 44

*Vance v. Judas Priest*,
No. 86-3939, 1990 WL 130920 (Nev. Dist. Ct. Aug. 24, 1990) .......... 41

*Vanderbilt v. Mitchell*,
67 A. 97 (N.J. App. 1907) .......... 22

*Vidal v. Elster*,
602 U.S. 286 (2024) .......... 15, 21, 26, 27

*Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*,
455 U.S. 489 (1982) .......... 52, 53

*Washington State Grange v. Washington State Republican Party*,
552 U.S. 442 (2008) .......... 10, 11

*Williams-Yulee v. Florida Bar*,
575 U.S. 433 (2015) .......... 21, 47, 49-50

*Willis v. Town Of Marshall, N.C.,*
*426 F.3d 251* (4th Cir. 2005) .......... 12

*Yarborough v. Alvarado*,
541 U.S. 652 (2004) .......... 44

*Zacchini v. Scripps-Howard Broad. Co.*,
433 U.S. 562 (1977) .......... 20

**STATUTES**

18 U.S.C. §1702 .......... 22

28 U.S.C. § 292(b) .......... 5

28 U.S.C. § 1291 .......... 2

28 U.S.C. § 1332(d) .......... 1

28 U.S.C. § 5931 .... 4

42 U.S.C. § 1320d-6.... 23

N.J. Stat. § 2C:20-31.1 .... 5

N.J. Stat. § 17:46B-1.1 .... 5

N.J. Stat. § 19:31-18:1 .... 5

N.J. Stat. § 46:26A-12.... 5

N.J. Stat. § 47:1-17.... 5

N.J. Stat. § 47:1A-1.1.... 5

N.J. Stat. § 47:1A-5.... 5

N.J. Stat. § 47:1B-1 .... 5

N.J. Stat. § 47:1B-2.... 5

N.J. Stat. § 47:1B-2(d) .... 51

N.J. Stat. § 47:1B-3.... 5

N.J. Stat. § 47:1B-4.... 5

N.J. Stat. § 56:8-166.1.... 5

N.J. Stat. § 56:8-166.3.... 5

W. Va. Code § 5A-8-21 .... 48

W. Va. Code § 5A-8-24 ....Passim

W. Va. Code § 21-5C-5 .... 42

W. Va. Code § 29B-1-1 .... 42

W. Va. Code § 29B-1-4 .... 48

W. Va. Code § 61-8-28(3)(b) .... 23

**RULES**

Fed. R. App. P. 34(a)(1) .... 55

**OTHER AUTHORITIES**

D. Solove, Access and Aggregation: Public Records, Privacy, and the Constitution, 86 U. Minn. L. Rev. 1137 (2002) .... 25

J. Campbell, Natural Rights and the First Amendment, 127 Yale L.J. 246 (2017) .... 22

Restatement (Second) of Torts, § 652A .... 16

Restatement (Second) of Torts, § 652B .... 17

Richards & Solove, Privacy's Other Path, 96 Geo. L. J. 139 .... 21

S. Warren & L. Brandeis, The Right to Privacy, 4 Harv. L. Rev. 193 (1890) .... 21, 23

Schauer, The Boundaries of the First Amendment: A Prelim. Exploration of Constitutional Salience, 117 Harv. L. Rev. 1765 (2004) .... 29

Smith, Benjamin Franklin's Web Site: Privacy and Curiosity from Plymouth Rock to the Internet 50 (2000) .... 22

W. Prosser, Privacy, 48 Cal. L. Rev. 383 (1960) .... 21

## JURISDICTIONAL STATEMENT

This consolidated appeal concerns Appeal No. 25-2121 (captioned *Michael Jackson v. Thomson Reuters America Corporation* and originating in the District Court for the District of the Northern District of West Virginia, under Case No. 1:24-cv-00088-MFU) ("Thomson Reuters"); Appeal No. 25-2122 (captioned *Michael Jackson v. Whitepages, Inc.* and originating in the District Court for the Northern District of West Virginia, under Case No. 1:24-cv-00080-MFU) ("Whitepages"); Appeal No. 25-2123 (captioned *Michael Jackson v. Thryv, Inc.* and originating in the District Court for the Northern District of West Virginia, under Case No. 1:24-cv-00096-MFU) ("Thryv"); Appeal No. 25-2124 (captioned *Michael Jackson v. PeopleConnect, Inc. et al.*, and originating in the District Court for the Northern District of West Virginia, under Case No. 1:24-cv-00102-MFU) ("PeopleConnect"); and Appeal No. 25-2125 (captioned *Michael Jackson v. LexisNexis Risk Solutions Inc.* and originating in the District Court for the Northern District of West Virginia, under Case No. 1:24-cv-00081-MFU) ("LexisNexis") (collectively, the "Matters").

The Matters were consolidated below on November 18, 2024 (JA118), and were consolidated by this Court on October 21, 2025. All concern whether Plaintiff-Appellant stated a claim against Defendants-Appellees for alleged violations of W. Va. Code § 5A-8-24 ("Daniel's Law").

The lower court had jurisdiction over the Matters pursuant to 28 U.S.C.

§ 1332(d) because, in each Matter, there are more than 100 putative class members, the aggregate amount in controversy exceeds $5,000,000.00, exclusive of interest, fees, and costs, and at least one putative class member is a citizen of a state different from at least one defendant. JA39, JA84, JA126, JA168, JA211.

Presently, in each of the Matters, Plaintiff-Appellant appeals a final judgment issued on August 19, 2025, granting the Defendants-Appellees' consolidated motion to dismiss. JA560-562. Plaintiff-Appellant filed a timely notice of appeal in each of the matters on September 17, 2025. JA563-567. The Court therefore has jurisdiction over this consolidated appeal under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES PRESENTED FOR REVIEW

1. Is Daniel's Law facially valid under the First Amendment?

## STATEMENT OF THE CASE

### A. Statement of Facts

The Matters arise from five separate cases, each heard in the District Court for the Northern District of West Virginia. The claims of these cases are essentially identical. Plaintiff-Appellant Michael Jackson ("Plaintiff-Appellant") is a retired law-enforcement officer from Braxton County, West Virginia who brings this case against Defendants-Appellees, who have each disclosed, redisclosed, or otherwise made available Mr. Jackson's home address and/or unpublished home or personal

telephone number, in violation of W. Va. Code § 5A-8-24 ("Daniel's Law"). JA38.[1]

According to the West Virginia Legislature:

> [W. Va. Code § 5A-8-24] adopts the name Daniel's Law. The source of the name of the law is a tragic story[] … of a person who compiled information – a dossier of information – about a federal judge in New Jersey. Her name is Judge Esther Salas. Her son, Daniel, was killed by the person who compiled the information. So the new protections … [are for] public officials and their family members.

JA35. As Judge Salas said:

> Currently, federal judges' addresses and other information is readily available on the Internet. In addition, there are companies that will sell your personal details that can be leveraged for nefarious purposes. In my case, this monster knew where I lived and what church we attended and had a complete dossier on me and my family. At the moment there is nothing we can do to stop it, and that is unacceptable. My son's death cannot be in vain, which is why I am begging those in power to do something to help my brothers and sisters on the bench.

JA36. In response to this tragedy, West Virginia passed Daniel's Law to "accomplish … the public policy of th[e] state, which is to enhance the safety and security of certain public officials in the justice system, … to foster the ability of these public servants who perform critical roles in the justice system, and to carry out their official duties without fear of personal reprisal[.]" W. Va. Code § 5A-8-

[1] Unless otherwise noted, all citations to the pleadings are to the First Amended Complaint against Whitepages. *See* JA34-78. The other operative complaints are materially the same. *See* JA79-115 (Thryv); JA121-162 (LexisNexis); JA163-204 (Thomson Reuters); JA205-257 (PeopleConnect). The lower court noted: "Unless otherwise indicated, all citations to the record are based on the docket in *Jackson v. Whitepages, Inc.*, No. 1:24-cv-080. The amended complaints in the above-captioned cases are largely identical, particularly in all respects relevant to the facial constitutional issues addressed in this memorandum opinion." JA519.

24(b). This law "further[s] a compelling government interest - the safety of [] judges and the derivative ability of the judiciary to function."[2] Daniel's Law provides, in pertinent part:

> Unless written permission is first obtained from the individual, a person, business, or association shall not disclose, redisclose, or otherwise make available the home address or unpublished home or personal telephone number of any active, formerly active, or retired judicial officer, prosecutor, federal or state public defender, federal or state assistant public defender, or law-enforcement officer under circumstances in which a reasonable person would believe that providing such information would expose another to harassment or risk of harm to life or property.

W. Va. Code § 5A-8-24(e). Despite this abundantly clear proscription, Defendants-Appellees have disclosed, redisclosed, or otherwise made available the home addresses and unpublished home or personal telephone numbers of thousands of West Virginia's active, formerly active, or retired judicial officers, prosecutors, federal or state public defenders, federal or state assistant public defenders, and law-enforcement officers ("Covered Persons"), including Plaintiff-Appellant. JA37.

---

[2] JA335 (quoting Judge Roslynn Mauskopf, then Director of the Administrative Office of the Courts, statement in support of the Daniel Anderl Judicial Security and Privacy Act, 28 U.S. Code § 5931, *et seq.*, https://perma.cc/7BUP-Q8W8). *See also* JA336 ("Likewise, Chief Justice John G. Roberts Jr., writing in his 2022 Year-End Report, recognized Congress for passing the bill, noting that 'a judicial system cannot and should not live in fear.'") (quoting https://perma.cc/ZKH4-2PZ2).

Notably, New Jersey's own Daniel's Law[3] has already survived first amendment challenges in New Jersey's Federal Court, Appellate Division, and Supreme Court. *Atlas Data Priv. Corp. v. We Inform, LLC*, 758 F. Supp. 3d 322 (D.N.J. Nov. 26, 2024) (facial challenge); *Kratovil v. City of New Brunswick*, 2024 WL 1826867 (N.J. App. Div. Apr. 26, 2024) (as-applied challenge); *Kratovil v. City of New Brunswick*, 261 N.J. 1 (N.J. June 17, 2025) (same).

**B. Procedural History**

Plaintiff-Appellant Jackson filed each of the Matters in the Circuit Court of Braxton County, West Virginia, and the respective Defendants-Appellees removed each of the Matters to the District Court for the Northern District of West Virginia between August 26, 2024 and October 28, 2024. JA2, JA8, JA14, JA20, JA28. Because Daniel's Law protects judicial and law enforcement officers in West Virginia, the Chief Judge of the Fourth Circuit reassigned the cases to Judge Michael F. Urbanski from the United States District Court for the Western District of Virginia. *See* JA33; 28 U.S.C. § 292(b).

A status conference with Plaintiff-Appellant and all Defendants-Appellees was held on November 14, 2024. JA118. The parties advised the court that Defendants-Appellees intended to file a consolidated motion to dismiss based the

[3] The New Jersey Daniel's Law as amended is codified as follows: N.J.S.A. 2C:20-31.1, 17:46B-1.1, 19:31-18:1, 46:26A-12, 47:1-17, 47:1A- 1.1, 47:1A-5, 47:1B-1, 47:1B-2, 47:1B-3, 47:1B–4, 56:8-166.1, 56:8-166.3.

argument that Daniel's Law was facially unconstitutional under the First Amendment. *Id.* Accordingly, the court set a briefing schedule and directed: "The initial motion to dismiss is limited to two issues: (1) the facial constitutionality of West Virginia's Daniel's Law under the First and Fourteenth Amendments to the United States Constitution and the Free Speech Clause of the West Virginia Constitution, and (2) Article III standing. No other grounds for dismissal or responsive pleadings by Defendants shall be due until after the court has ruled on the motion to dismiss." JA118-119. The order noted that Defendants-Appellees would not be deemed to have waived any other grounds for dismissal. JA119. The court further gave each Defendant-Appellee the option of filing an individual brief but required any Defendant-Appellee that chose this option to alert Plaintiff-Appellant on or before January 27, 2025. *Id.* Finally, the court otherwise stayed the cases pending resolution of the consolidated motion to dismiss. JA120.

On January 24, 2025, all Defendants-Appellees filed a consolidated motion to dismiss and memorandum in support thereof. JA258-314. No Defendant-Appellee exercised the option to submit an individual brief, and no Defendant-Appellee briefed Article III standing. *Id.* Defendants-Appellees contended (1) that Section E of West Virginia's Daniel's Law is unconstitutional under the First and Fourteenth Amendments, as a content-based regulation of speech subject to strict scrutiny, and (2) that Section E of West Virginia's Daniel's Law is unconstitutionally vague under

the Due Process Clause of the Fourteenth Amendment. *Id.* Plaintiff-Appellant responded in opposition on March 3, 2025 (JA324-375), and Defendants-Appellees replied on March 31, 2025. JA376-409. An oral argument was held on May 9, 2025, in Clarksburg, West Virginia. JA414-515.

On August 19, 2025, the lower court issued an order granting Defendants-Appellees' consolidated motion to dismiss. JA560-562. The lower court held, *inter alia*, that "Section E [of Daniel's Law] regulates speech based on its content. … [And] Section E cannot survive strict scrutiny because it is not narrowly tailored." JA518. Plaintiff-Appellant filed a timely notice of appeal in each of the matters on September 17, 2025. JA563-567.

## SUMMARY OF THE ARGUMENT

The lower court erred in granting Defendants-Appellees' consolidated motion to dismiss.

First, the lower court erred in holding that Daniel's Law is subject to strict scrutiny. Daniel's Law is subject, at most, to intermediate scrutiny because it regulates the disclosure of data rather than protected speech; it is not content-based; statutes recognizing privacy torts are not subject to strict scrutiny in facial challenges; the statute bears no nexus to viewpoint discrimination; and the statute regulates commercial speech.

Second, the lower court erred in holding that Daniel's Law fails under the

applicable standard of review. Daniel's Law withstands any level of scrutiny, including strict scrutiny. The statute is neither overinclusive nor overbroad. West Virginia's Daniel's Law protects Covered Persons in real-time and is further narrowed by the fact that it only applies liability when its objective "reasonable person" standard is met.[4]

## ARGUMENT

### I. STANDARD OF REVIEW

A lower court's decision regarding the constitutionality of a statute is an issue of law reviewed *de novo*. *See, e.g.*, *United States v. Fulks*, 454 F.3d 410, 437 (4th Cir. 2006) ("We review de novo a district court's ruling concerning the constitutionality of a statute.") (citing *United States v. Williams*, 364 F.3d 556, 559 (4th Cir. 2004)); *United States v. Browning*, 109 F. App'x 542, 544 (4th Cir. 2004); *Fusaro v. Howard*, 19 F.4th 357, 366 (4th Cir. 2021). "In reviewing a motion to dismiss, [the court] accept[s] the complaint's factual allegations as true and draw[s] all reasonable inferences in favor of the plaintiff." *Hebb v. City of Asheville, N. Carolina*, 145 F.4th 421, 432 (4th Cir. 2025) (citation omitted). A plaintiff's allegations are sufficient to overcome a Rule 12(b)(6) motion if they contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 547 (2007).

---

[4] The Court below did not address Defendants-Appellees' vagueness challenge.

Relevant here, a defendant who seeks to challenge the constitutionality of a statute can do so as a facial attack or as-applied attack. "The difference between a facial challenge and an as-applied challenge lies in the scope of the constitutional inquiry." *Educational Media Co. v. Insley*, 731 F.3d 291, 298 n.5 (4th Cir. 2013) (citation omitted). "[A] court considering a facial challenge is to assess the constitutionality of the challenged law 'without regard to its impact on the plaintiff asserting the facial challenge,'" while "an as-applied challenge is 'based on a developed factual record and the application of a statute to a specific person.'" *Id.* (quotation and alterations omitted). "Accordingly, as-applied challenges are fact-specific, and categorically easier to mount." *Nat'l Pub. Radio, Inc. v. Klavans*, 560 F. Supp. 3d 916, 924 n.5 (D. Md. 2021) (citing *United States v. Hosford*, 843 F.3d 161, 165 (4th Cir. 2016)). Defendants-Appellants argued below that Daniel's Law is a "content-based restriction on speech" that cannot "survive a facial constitutional challenge." JA284.

A facial attack on the constitutional validity of a statute is "the 'most difficult challenge to mount successfully,' because the defendant must 'establish that no set of circumstances exists under which the Act would be valid.'" *United States v. Rahimi*, 144 U.S. 1889, 1898 (2024) (*quoting United States v. Salerno*, 481 U.S. 739, 745 (1987)). "[T]o prevail" against a facial attack, Plaintiff need only show that Daniel's Law "is constitutional in some of its applications." *Id*. And because

"litigants typically lack standing to assert the constitutional rights of third parties," *United States v. Hansen*, 599 U.S. 762, 769 (2023), a facial challenge fails if the statute "is constitutional as applied to" the Defendants-Appellees' "own case." *Rahimi*, 144 U.S. at 1898.

The overbreadth doctrine recognizes "'a second type of facial challenge, whereby a law may be invalidated as overbroad if a substantial number of its applications are unconstitutional, judged in relation to the statue's plainly legitimate sweep." A*mericans for Prosperity Foundation v. Bonta*, 594 U.S. 595, 615 (2021). Defendants-Appellees never tried to meet this burden. Instead, Defendants-Appellees "raise[d] the specter of a number of hypotheticals where the home address or the unlisted phone number of a covered person may be newsworthy and thus of public significance." *Atlas*, 758 F. Supp. 3d at 337. "If any of these hypotheticals ever comes to pass, the defendants' remedy is to challenge Daniel's law as unconstitutional as applied." *Id.*

Courts "disfavor[]" facial challenges for several important reasons. *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 450 (2008). "Claims of facial invalidity often rest on speculation," which "raise[s] the risk of 'premature interpretation of statutes on the basis of factually barebones records.'" *Id*. (*quoting Sabri v. United States*, 541 U.S. 600, 609 (2004) (quotation marks omitted)). Such challenges also are "contrary to the fundamental principle of

judicial restraint that courts should neither anticipate a question of constitutional law in advance of the necessity of deciding it nor formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied." *Id*. (quotation marks and citation omitted). Indeed, Justices have doubted whether courts even have "the power to pronounce that a statute is unconstitutional in all applications." *Americans for Prosperity Found. v. Bonta*, 594 U.S. 595, 621 (2021) (Thomas, J., concurring); *see also Chicago v. Morales*, 527 U.S. 41, 77 (1999) (Scalia, J., dissenting) ("[To] pronounce that the statute is unconstitutional in all applications [is] no more than an advisory opinion—which a federal court should never issue at all."). Finally, "facial challenges threaten to short circuit the democratic process by preventing laws embodying the will of the people from being implemented in a manner consistent with the Constitution." *Washington State Grange*, 552 U.S. at 450.

## II. DANIEL'S LAW IS NOT SUBJECT TO STRICT SCRUTINY

### A. The Data at Issue Is Not Speech

The lower court held that "Section E of West Virginia's Daniel's Law regulates speech. … [F]actual disclosures of individuals' personal data[] … constitute speech." JA529-530. This is incorrect. Precedent defines "speech" as expressive activity "intended to be communicative" and, "in context, would reasonably be understood … to be communicative." *Clark v. Community for*

*Creative Non-Violence*, 468 U.S. 288, 294 (1984). "In deciding whether particular conduct possesses sufficient communicative elements to bring the First Amendment into play" the Court must find that "[a]n intent to convey a particularized message was present" and that "the likelihood was great that the message would be understood by those who viewed it." *Texas v. Johnson*, 491 U.S. 397, 404, (1989).

In many, if not most applications, Daniel's Law does not implicate, let alone restrict "speech." First, not everything that qualifies as a "disclosure" under Daniel's Law involves speech with a message or thought. To be sure, a speaker can use an address or phone number in speech. But in and of itself, an address or phone number posted online or sold to a marketer is not a message or thought and "simply do[es] not involve the sort of expressive association that the First Amendment has been held to protect." *Willis v. Town Of Marshall, N.C., 426 F.3d 251, 258* (4th Cir. 2005). Instead, such pure "fact[s]" are only "elements of speech." *Rumsfeld v. Forum for Academic and Institutional Rights, Inc.*, 547 US. 47 at 61-62 (2006), which qualify for First Amendment protection only when a speaker gives them "an expressive or communicative 'use'" in a complete speech act intended to express the speaker's own message. *Troster v. Pennsylvania State Dept. of Corrections,* 65 F.3d 1086 at 1092 (3d. Cir. 1995) (citing *Spence v. State of Wash.*, 418 U.S. 405 at 410 (1974)).

### B. Daniel's Law Is Not Content-Based

The lower court also wrongly found that "West Virginia's Daniel's Law regulates speech based on its content." JA531. Content-based restrictions warrant strict scrutiny when they are facially content-based or are content-based in their practical operation. *City of Austin v. Reagan Nat'l Advertising of Austin, LLC*, 596 U.S. 61, 69, 76 (2022). Daniel's Law fits neither category.

First, Daniel's Law does not facially target speech based on the "communicative content" of a speech act, which is the "topic discussed or an idea or message expressed." *City of Austin*, 596 U.S. at 69 (quotation marks and citation omitted). A disclosure simply listing the home address or phone number of a Covered Person does not "discuss" any "topic" or express a "substantive message." *Id.* at 71. Instead, the statute applies to acts of disclosure containing specific bits of data that create a very real threat for public servants and their families.

The lower court disagreed, finding "West Virginia's Daniel's Law turns on … whether [the] 'communicative content' or 'topic' or 'subject matter' is the address of a protected person[.]" JA533. But this ignores *City of Austin*'s interpretation of *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155 (2015). *City of Austin* explicitly rejected "the view that any examination of speech or expression inherently triggers heightened First Amendment concern." 596 U.S. 61, 73-74 (2022) (emphasis in original). As *City of Austin* clarified, *Reed* was premised on "the First Amendment's

hostility to content-based regulation" aimed at "particular viewpoints" or prohibition of "public discussion of an entire topic." 596 U.S. at 70 (internal alterations and quotations omitted). *Reed* deemed the subject regulation content-based because it singled out speech based on whether it "*conveys the message* of directing the public to church or some other 'qualifying event,'" and treated "the Church's signs inviting people to attend its worship services … differently from signs *conveying other types of ideas*." 576 U.S. at 164 (emphases added).

At most, Daniel's Law is content-based as applied to "disclosures" that communicate a speaker's own message, rather than simply regurgitating addresses and phone numbers. Some of the cases cited in Defendants-Appellees' briefing below (JA283-284) effectively concede as much, suggesting that regulation of data is content-based only when the data is "integral to [the speaker's] message." *Ostergren v. Cuccinelli*, 615 F.3d 263, 271 (4th Cir. 2010); *see also Sorrell v. IMS Health Inc.*, 564 U.S. 552, 564-65 (2011). Other cases previously cited by Defendants-Appellees held that a statute is content-based if applying the statute "requires the examination" of the disclosure—precisely the test rejected by *City of Austin*. *See Sheehan v. Gregoire*, 272 F.Supp.2d 1135, 1146 (W.D. Wash. 2003); *Publius v. Boyer-Vine*, 237 F.Supp.3d 997, 1013 (E.D. Cal. 2017); *IMDb.com Inc. v. Becerra*, 962 F.3d 1111, 1120 (9th Cir. 2020). Others simply assumed that a statute prohibiting disclosure of names and addresses is facially content-based

without explaining how such data in itself constitutes a topic or message. *See Brayshaw v. City of Tallahassee*, 709 F.Supp.2d 1244 (N.D. Fla. 2010).

Second, the West Virginia legislature did not intend to suppress substantive communications discussing any topic, idea, or message. *City of Austin*, 596 U.S. at 69. Daniel's Law simply seeks to strengthen protections against the undisputed dangers facing a Covered Person as a result of their public service, a noble but neutral goal that even Defendants-Appellees support. Like the regulation in *City of Austin*, Daniel's Law is "agnostic" about the substantive content or message expressed by the speaker. And "absent a content-based purpose or justification," a statute "is content neutral and does not warrant the application of strict scrutiny." *Id.* at 69.

### C. Statutes Recognizing Privacy Torts Are Not Subject to Strict Scrutiny, Regardless of Whether They Are Content Based

Even if Daniel's Law were content based, strict scrutiny would not apply to virtually any of its applications. Supreme Court precedent recognizes that when a content-based restriction has a history of "longstanding coexistence … with the First Amendment," courts should not apply strict scrutiny. *Vidal v. Elster*, 602 U.S. 286, 288 (2024). Daniel's Law creates a tort closely related to three traditional privacy torts—public disclosure, misappropriation of name and likeness, and intrusion upon seclusion—which have long existed in harmony with the First Amendment.

**First**, the tort created by Daniel's Law closely resembles the "public disclosure of private information" tort recognized by virtually every state. *See Crump v. Beckley Newspapers, Inc.*, 173 W. Va. 699, 713 (1983) (adopting Restatement (Second) of Torts § 652A-E). Daniel's Law similarly targets "disclosures" that give publicity to facts generally of no legitimate concern to the public, with the only differences being that Daniel's Law provides a remedy to a specific class of Covered Persons who face special risks of being subjected to threats, violence, and harassment as a result of their public service.

**Second**, Daniel's Law protects the right to control one's name traditionally protected by the misappropriation-of-name-and-likeness tort. The economic value of prohibited disclosures are directly related to the use of the Covered Person's name, because it is impossible to sell someone's home address or phone number as that person's home address or phone number, without also using their name in the disclosure. The law in West Virginia and elsewhere has long recognized that "right of publicity … remedies the unjust enrichment caused by an unauthorized exploitation of the good will and reputation that a public figure develops in his name or likeness through the investment of time, money and effort." *Crump v. Beckley Newspapers, Inc.*, 173 W. Va. 699, 714 (W. Va. 1983); Restatement (Second) of Torts §652A. Many acts of "disclosure" identified by the statute—such as "advertise," or "deliver"—govern the potential appropriation of a Covered Person's

home address and phone number.

**Third**, Daniel's Law protects the same interests as the "intrusion upon seclusion" tort, which is the "intentional[ ] intru[sion], physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns." *Krakauer v. Dish Network, L.L.C.*, 925 F.3d 643, 653 (4th Cir. 2019) (citing Restatement (Second) of Torts, § 652B). Preventing widespread publication of a Covered Person's home address and phone number makes it harder for third parties to intrude upon their private lives. And Daniel's Law allows Covered Persons to have their information redacted from public and commercial records to protect their seclusion. The demonstrated "longstanding coexistence" between the privacy torts created by statutes like Daniel's Law and the First Amendment forecloses the application of strict scrutiny.

### 1. Privacy Torts, Like Daniel's Law, Are Not Subject to Strict Scrutiny

In analyzing the New Jersey Daniel's Law, another federal court found that because "Daniel's Law furnishes a remedy for disclosing certain private information and exposing covered persons to fear of reprisal and to personal danger" it was "a privacy statute." *Atlas*, 758 F. Supp. 3d at 336. Further, the court held that because the law was a privacy statute, its content-based regulation of speech was not subject to strict scrutiny. *Id.* at 336-337. Judge Urbanski was unpersuaded, holding: "the *Atlas* opinion sounds in a rational basis review register[,]" and "[t]he *Atlas* court's

analysis does not sway this court's conclusion that strict scrutiny applies to West Virginia's Daniel's Law. Fourth Circuit precedent requires this court to apply strict scrutiny[.]" JA538. The Court should reject this and follow *Atlas*.

The Supreme Court has never suggested that privacy torts are facially unconstitutional or subject to strict scrutiny in all applications. To the contrary, "the sensitivity and significance of the interests presented in clashes between [the] First Amendment and privacy rights counsel relying on limited principles that sweep no more broadly than the appropriate context of the instant case." *Florida Star v. B.J.F.*, 491 U.S. 524, 533 (1989). Citing the Supreme Court's practice of narrowly circumscribing its holdings in this area, courts in the Fourth Circuit have found it necessary to strike the "appropriate balance between privacy interests and the interests protected by the First Amendment" and decide cases in this area "narrowly" based on "the facts presented in the record." *Ostergren v. McDonnell*, 2008 WL 3895593, at *6 (E.D. Va. Aug. 22, 2008), *aff'd sub nom. Ostergren v. Cuccinelli*, 615 F.3d 263 (4th Cir. 2010). This principle is especially important here—where the lower court applied strict scrutiny in a facial challenge to a privacy law, only to disregard key aspects of the statute's factual context, purpose, and effect. *See infra* § III. *Atlas* accounted for this, while the lower court did not.

The Supreme Court has rejected the application of strict scrutiny as a facial matter where privacy torts clash with the First Amendment. In *Time, Inc. v. Hill*,

385 U.S. 374 (1967), the Court's first case addressing privacy torts and the First Amendment, the Supreme Court held that the First Amendment requires a plaintiff asserting a "false light" claim against speech on a matter of public concern to prove that the defendant "published the report with knowledge of its falsity or with reckless disregard of the truth." *Id.* at 387-88. But the Court refused to hold the statute "unconstitutional on its face." *Id.* at 397. *Cox Broadcasting Corp. v. Cohn*, 420 U.S. 469 (1975), acknowledged that in the "collision between claims of privacy and those of the free press, the interests on both sides are plainly rooted in the traditions and significant concerns of our society," and thus "focus[ed] on the narrower interface between press and privacy that this case presents." *Id.* at 491. *Florida Star* again emphasized that courts should resolve conflicts "between the right which the First Amendment" protects and "the protections which various statutes and common-law doctrines accord to personal privacy against the publication of truthful information" only "in a discrete factual context." 491 U.S. at 530. *Bartnicki v. Vopper*, 532 U.S. 514 (2001), reiterated the Court's "repeated refusal to answer categorically" whether privacy restraints on "truthful publication" are "consistent with the First Amendment," and held only that the "privacy concerns" present on the facts of those cases were outweighed by "the interest in publishing matters of public importance." *Bartnicki*, 532 U.S. at 529, 534.

For misappropriation of name and likeness, the Supreme Court has likewise

held that "the First and Fourteenth Amendments do not immunize the media" from misappropriation claims based on "a right of publicity existing under state law." *Zacchini v. Scripps-Howard Broad. Co.*, 433 U.S. 562, 574-75 (1977). Courts thus "must balance the interests underlying the right to free expression against the interests in protecting the right of publicity" in the context of a particular case. *Hart v. Electronic Arts, Inc.*, 717 F.3d 141, n.47 (3d Cir. 2013); *see also Rice v. Paladin Enterprises, Inc.*, 128 F.3d 233, 247 (4th Cir. 1997); *Kellman v. Spokeo, Inc.*, 599 F. Supp. 3d 877, 901 (N.D. Cal. 2022) ("[T]he Supreme Court has expressly held that imposing liability for violating the traditional publicity right does not necessarily offend the First Amendment.").

This approach to conflicts between privacy and the First Amendment is necessary because privacy cases balance free speech with the constitutional interest "in avoiding disclosure of personal matters." *Nixon v. Administrator of Gen. Servs.*, 433 U.S. 425, 457 (1977); *Am. Fed'n of Gov't Emps., AFL-CIO, Loc. 1923 v. U.S., Dep't of Health & Hum. Servs.*, 712 F.2d 931, 932 (4th Cir. 1983) ("Employees have a strong privacy interest in their home addresses"). When "the exercise of free speech rights conflicts with another fundamental right," reasonable compromises "survive[] strict scrutiny." *Burson v. Freeman*, 504 U.S. 191, 211 (1992). That compromise is embodied in existing precedent, which rejects any attempt to mechanically apply a test for content- based restrictions to Daniel's Law. By itself,

this is enough to defeat a facial challenge, which is inherently unsuited to consider the application of a statute to the unique facts of every potential application.

### 2. History and Tradition Show Daniel's Law Isn't Subject to Strict Scrutiny

The Supreme Court's rejection of strict scrutiny for statutes recognizing privacy torts is supported by their long history of coexistence with the First Amendment. As the Supreme Court has repeatedly held, "history and tradition" illuminate "the scope of the First Amendment." *Vidal*, 602 U.S. at 301; *see City of Austin*, 596 U.S. at 75 (citing an "unbroken tradition of on-/off premises distinctions"); *Williams-Yulee v. Florida Bar*, 575 U.S. 433, 446 (2015) (recognizing "history and tradition" determines the scope of the First Amendment). Because such torts have "deep roots in our legal tradition," Daniel's Law is not subject to strict scrutiny, and its validity should only be evaluated through a case-specific assessment of the privacy and First Amendment interests at stake in a particular case. *Vidal*, 602 U.S. at 301; *see also State v. VanBuren*, 214 A.3d 791 at 802 (Vt. 2019) ("United States legal history supports the notion that states can regulate expression that invades individual privacy without running afoul of the First Amendment."); S. Warren & L. Brandeis, The Right to Privacy, 4 Harv. L. Rev. 193 (1890); W. Prosser, Privacy, 48 Cal. L. Rev. 383 (1960) (collecting cases).

Statutory protections for confidentiality likewise date back to the early Republic. *See* Richards & Solove, Privacy's Other Path, 96 Geo. L. J. at 139-142.

In 1782, the Continental Congress passed a law to protect the confidentiality of letters. *See* Smith, Ben Franklin's Web Site: Privacy and Curiosity from Plymouth Rock to the Internet 50 (2000). In 1825, well after the enactment of the First Amendment to the Constitution, Congress passed a law protecting the confidentiality of letters. Act of Mar. 3, 1825, ch.64, §22, 4 Stat. 102 (codified as amended at 18 U.S.C. §1702). In 1889, Congress enacted a law fining census officials $500 for disclosing confidential information. *See* Act of Mar. 1, 1889, ch. 319, §§ 8, 13, 25 Stat. 760, 763, 764.

The early cases developing the privacy torts were careful to reconcile privacy interests with free speech in accordance with the original meaning of the First Amendment. Under the original understanding, speech and press freedoms were "natural rights" that were "subject to restrictions under laws that promoted the public good" and that prevented interference "with the rights of others." J. Campbell, Natural Rights and the First Amendment, 127 Yale L.J. 246, 276-77 (2017). Early cases developing privacy torts applied precisely this approach. For example, the leading case of *Pavesich v. New England Life Ins. Co.*, 50 S.E. 68 (Ga. 1905), employed "the common law" method of "judg[ing] according to the law of nature and the public good." *Id.* at 69; *see also Vanderbilt v. Mitchell*, 67 A. 97, 100 (N.J. App. 1907) (adopting *Pavesich*). The court determined that "[t]he right of privacy … is a right derived from natural law," but which is "unquestionably limited by the

right to speak and print." *Pavesich*, 50 S.E. at 71 & 74. To reconcile these competing rights, the court followed the approach of Founding-era courts and held that First Amendment interests were adequately protected by building into common-law privacy torts a principle that "[t]he truth may be spoken … about all matters of a public nature, as well as matters of a private nature in which the public has a legitimate interest." *Pavesich*, 50 S.E. at 74; *see also* The Right to Privacy, 4 Harv. L. Rev. at 193, n.42.

The accommodation of interests reflected in these cases has proven workable for more than a century. Over the same period, common-law privacy rights have regularly been integrated into statutory rights to restrain disclosure. *See e.g.*, 42 U.S.C. § 1320d-6 (preventing healthcare provider from disclosing certain information without patient's consent); W. Va. Code, § 61-8-28(3)(b) ("It is unlawful for a person to knowingly visually portray another person without that other person's knowledge, while that other person is fully or partially nude and is in a place where a reasonable person would have an expectation of privacy").

Daniel's Law is in keeping with this long tradition. Like other privacy torts, the statute grants Covered Persons the right to prevent others from giving unreasonable publicity to personal facts of little to no public significance and misappropriating their identity. The statute does not imperil First Amendment interests any more than traditional common-law disclosure, misappropriation, and

intrusion torts—indeed, it restricts speech far less than common-law protections that prohibit disclosure of private facts based on the risk of emotional, reputational, or dignitary harm. *See e.g., Krause v. Rocketreach*, 561 F. Supp. 3d 778, 783-84 (N.D. Ill. 2021) (rejecting First Amendment argument against Illinois' identity misappropriation statute); *Kolebuck-Utz v. Whitepages Inc.*, 2021 WL 1575219, at *3 (W.D. Wash. Apr. 22, 2021) (same with Ohio right to publicity statute); *Camacho v. Control Grp. Media Co., LLC*, 2022 WL 3093306, at *19 (S.D. Cal. July 18, 2022) (same). Daniel's Law is targeted at information that subjects officers and other Covered Persons to harassment or risk of harm to life or property; courts routinely allow disclosure torts to be used to prevent disclosure of such information. *See, e.g., Capra v. Thoroughbred Racing Ass'n of N. Am., Inc.*, 787 F.2d 463, 464 (9th Cir. 1986); *Hyde v. City of Columbia*, 637 S.W.2d 251, 254 (Mo. Ct. App. 1982).

Further, the data regulated by Daniel's Law has virtually no relationship with matters of public concern. "Speech deals with matters of public concern when it can be fairly considered as relating to any matter of political, social, or other concern to the community, or when it is a subject of legitimate news interest." *Snyder v. Phelps*, 562 U.S. 443, 453 (2011). The specific home address and phone number of a judge, prosecutor, or law enforcement officer has no bearing on any question of political or social significance. *See Atlas*, 758 F. Supp. 3d at 337 ("[T]he court concludes that the home addresses and unpublished phone numbers are not matters of public

significance."); *see also Trans Union Corp v. F.T.C.*, 267 F.3d 1138 at 1140 (2001) ("[N]ames, addresses, and financial circumstances" were "speech of purely private concern"). Absent home address and phone number data, the data brokers may carry on with their business.

Defendants-Appellees argued that Daniel's Law "captures information that is already in the public domain, even though republishing information that is already publicly available cannot … threaten the government's interests." JA288-289. But this is wrong. Privacy violations can occur when information is republished in a way that greatly expands access to that information. "[T]he extent of the protection accorded a privacy right at common law rested in part on the degree of dissemination of the allegedly private fact," and not merely whether the information was available in some form. *United States Dep't of Justice v. Reporters Committee for Freedom of the Press*, 489 U.S. 749, 763-64 (1989) (recognizing a "distinction, in terms of personal privacy, between scattered disclosure of bits of information" in public records and widespread "revelation"); *see also* D. Solove, Access and Aggregation: Public Records, Privacy, and the Constitution, 86 U. Minn. L. Rev. 1137, 1173 (2002) ("Privacy involves an expectation of a certain degree of accessibility of information" and "can be violated by altering levels of accessibility, by taking obscure facts and making them widely accessible."). To apply strict scrutiny notwithstanding the privacy rights at issue would ignore this long line of precedent.

### D. Daniel's Law Has No Nexus with Viewpoint Discrimination

In addressing Plaintiff's argument that content-based laws can be subject to lesser scrutiny where viewpoint discrimination is not afoot, the lower court concluded that this argument was "foreclosed by *Reed*[,]" and improperly reliant on "*Vidal v. Elster*, which concerned content-based trademark regulations[.]" JA534. This is incorrect.

It is well-recognized, even beyond *Vidal*, that "content-based and viewpoint-based discrimination are not the same." *Hines v. Pardue*, 117 F.4th 769, 788 (5th Cir. 2024) (Carrillo Ramirez, J.) (concurring). Viewpoint discrimination exists "when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995). Because viewpoint discrimination is "uniquely harmful to a free and democratic society," *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 187 (2024), it is "presumptively unconstitutional[.]" *Rosenberger*, 515 U.S. at 830.

Not all content discrimination is viewpoint discrimination. *Reed v. Town of Gilbert*, 576 U.S. 155, 168–69 (2015); *see also, e.g.*, *Iancu v. Brunetti*, 588 U.S. 388, 420 (2019) (Sotomayor, J., concurring in part and dissenting in part) (describing a breach-of-the-peace statute as "viewpoint-neutral content discrimination"). And when "'there is no realistic possibility that official suppression of ideas is afoot,'" strict scrutiny does not apply. *Vidal*, 602 U.S. at 316 (Barrett, J., concurring); *see*

*also id.*, slip op. at 1 (Kavanaugh, J., concurring) (accepting that a "viewpoint-neutral" restriction "might well be constitutional even absent such a historical pedigree"); *Davenport v. Washington Educ. Ass'n*, 551 U.S. 177, 188 (2007) (identifying "numerous" cases where risk of viewpoint discrimination "is inconsequential, so strict scrutiny is unwarranted.").

Here, Daniel's Law creates no risk of viewpoint discrimination, so it should be upheld if its restrictions are "reasonable" considering the statute's purposes. *Davenport*, 551 U.S. 177 at 189. "No matter the message" a party disclosing information about a Covered Person "wants to convey," the statute "prohibits" disclosing the Covered Person's address and phone number "without consent." *Vidal*, 602 U.S. at 293-94. The statute does not target disclosures "based on the specific motivating ideology or the opinion or perspective of the speaker." *Reed*, 576 U.S. at 168 (cleaned up). Nor does the statute exhibit any features suggesting it was designed to "discriminate based on viewpoint in its practical operation." *Vidal*, 602 U.S. at 294. "[T]here are many reasons why a person may be unable to secure another's consent" to republish his address and phone number which have nothing to do with viewpoint, such as "to prevent his name from being exploited for another's gain." *Id.*

Judge Urbanski held that "West Virginia's Daniel's Law indeed prohibits public discussion of an entire topic—the home addresses and phone numbers of

protected individuals." JA534-535. But this is incorrect. The statute only prohibits "disclosures" rather than "discussion" of two narrow types of data—a Covered Person's home address and phone number. No other data is excluded from any "disclosure." And as courts have recognized when analyzing New Jersey's law, speech about where a Covered Person lives (and presumably, similar statements about a Covered Person's phone number) is not barred in any way by Daniel's Law. *Atlas*, 758 F. Supp. 3d at 337 ("Daniel's Law does not inhibit in any meaningful way the public's knowledge of public officials or its ability to hold them accountable for their performance and behavior."); *Kratovil*, 2024 WL 1826867, at *5; *Kratovil*, 261 N.J. at 26.

Analogies with other areas of First Amendment doctrine further support this conclusion. **First**, speech "can be constitutionally proscribed because the social interest in order and morality outweighs the negligible contribution of those categories of speech to the marketplace of ideas." *Davenport*, 551 U.S. at 188. Preventing widespread dissemination of the home addresses and phone numbers of judges, prosecutors, and law enforcement officers ensures the preservation of order. Re-publication of home address and phone numbers, particularly at the massive, automated scale involved here, makes no real contribution to the marketplace of ideas on any subject other than where someone lives and how to contact them. *Cf. Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 762 (1985)

(holding "credit reporting" did not "require[] special protection to ensure that 'debate on public issues [will] be uninhibited, robust, and wide-open.'") (citation omitted); *Trans Union*, 267 F.3d at 1141 (marketing lists were "private speech warranting only qualified constitutional protection").

**Second**, "the risk that content-based distinctions will impermissibly interfere with the marketplace of ideas" is limited "when the government is acting in a capacity other than as regulator." *Davenport*, 551 U.S. at 188. For example, "it is well established that the government can make content-based distinctions when it subsidizes speech" or permits speech in "a nonpublic forum." *Id.* at 188-89 (upholding statute that required public-sector unions to receive authorization from a nonmember before spending that nonmember's agency fees on election-related purposes). Here, the State does not act as a regulator— rather Daniel's Law grants individual persons the power to control the republication of their home address and phone number, much as the statute upheld in *Davenport* empowered individuals to prevent unions from spending fees they contributed to the union on election-related speech without authorization. Laws that recognize one private person's rights against another private person often attract no scrutiny at all when there is no risk of viewpoint discrimination.[5]

---

[5] *See* Schauer, The Boundaries of the First Amendment: A Prelim. Exploration of Constitutional Salience, 117 Harv. L. Rev. 1765, 1768 (2004) (collecting examples of similar content-based regulation that receive no scrutiny at all).

Thus, the purpose of Daniel's Law, its practical application, and precedent declining to apply strict scrutiny to other forms of content-based restrictions makes clear that Daniel's Law has no nexus with viewpoint discrimination and therefore should not be subject to strict scrutiny.

### E. At Most, Daniel's Law Regulates Commercial Speech

The lower court ruled that Daniel's Law did not concern solely commercial speech because "disclosing an address or phone number states a fact that could be used for any number of noneconomic purposes, such as promoting transparency or allowing a user of a database to locate an old friend who has moved." JA536. But many data "disclosures" regulated by Daniel's Law qualify as commercial speech, including the exact type of data at issue in this case, "merit[ing] only intermediate scrutiny." *Trans Union*, 267 F.3d at 1141 (marketing lists of names and addresses were commercial speech).

"By its plain meaning, commercial speech is speech specifically related to commercial transactions." *Maryland Shall Issue, Inc. v. Anne Arundel Cnty. Maryland*, 91 F.4th 238, 248 (4th Cir. 2024). "Thus, to be sure, speech that proposes a commercial transaction is commercial." *Id.* (citations omitted). "But speech is also commercial if it is 'related solely to the economic interests of the speaker and its audience.'" *Id.* (*citing Cent. Hudson Gas and Elec. Corp. v. Public Serv. Comm'n of New York*, 447 U.S. 557, 561 (1980). "And speech connected with the sale of a

good or a service — promoting the product or service, explaining it, or giving warnings about it — is commercial; it serves either the interests of the seller or 'assists consumers and furthers the societal interest.'" *Id.* "Thus, while commercial speech includes speech proposing a commercial transaction, it also includes the advertising and promotion of products and services, assembly or user instructions, information about the product or service, disclaimers, and warnings on health and safety." *Id.*

Daniel's Law is directed at many commercial acts, making it unlawful to "disclose, redisclose, or otherwise make available the home address or unpublished home or personal telephone number" of Covered Persons. W. Va. Code Ann. § 5A-8-24(e). Defendants' "disclosures" were driven by an economic motivation and were necessarily incident to speech that "does no more than propose a commercial transaction." *Bolger v. Youngs Drug Prod. Corp.*, 463 U.S. 60, 66 (1983) (quotation marks and citation omitted). While home address and phone number data offered in such transactions may not, by itself, "refer" to a product or service, such data is a product or service. And many businesses use the home address and phone number data within the ambit of Daniel's Law for the purpose of identifying people to target with marketing. *See, e.g.*, *U.S. West, Inc. v. F.C.C.*, 182 F.3d 1224, 1233 n.4 (10th Cir. 1999).

Relatedly, the lower court considered Plaintiff's argument that "disclosures of

addresses and phone numbers on people search websites [serve as] advertisements because [c]ompanies (including some Defendants) will post the home addresses and phone numbers of persons to draw customers to their sites, who in turn will then see advertisements for other goods and services." JA535 (cleaned up). Judge Urbanski found that "these arguments would apply just as well to The New York Times." *Id.* But that reasoning is an oversimplification that misconstrues the proper First Amendment inquiry.

"The identity of the speaker is not decisive in determining whether speech is protected." *Pac. Gas & Elec. Co. v. Pub. Utilities Comm'n of California*, 475 U.S. 1, 8 (1986). "When a message communicates both commercial and noncommercial speech, it is treated like commercial speech unless the commercial and noncommercial messages are 'inextricably intertwined.'" *Handsome Brook Farm, LLC v. Humane Farm Animal Care, Inc.*, 700 F. App'x 251, 261 (4th Cir. 2017) (quoting *Riley v. Nat'l Fed. of the Blind of N.C., Inc.*, 487 U.S. 781, 796 (1988)). For example, "an educational seminar hosted by a corporation that sells houseware, where attendees both may purchase the products and learn 'how to be financially responsible and how to run an efficient home,' is still treated as commercial speech." *Id.* (quoting *Bd. of Trustees of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 473-74 (1989)). "[T]here is nothing whatever 'inextricable' about the noncommercial aspects of these presentations. No law of man or of nature makes it impossible to

sell housewares without teaching home economics, or to teach home economics without selling housewares." *Id.* (citation omitted). Likewise, "'[n]o law of man or of nature makes it impossible' to warn the public of misleading labeling without promoting one's own products." *Id.*

Accordingly, when The New York Times publishes reporting on a matter of public concern, that speech is protected. But, as the lower court recognized, Daniel's Law does not focus on journalism. *Compare* JA543 (recognizing, in *Kratovil*, "[t]he journalist filed a complaint seeking declaratory and injunctive relief from application of New Jersey's Daniel's Law, hoping to eventually publish a story on the issue of whether the Police Director was adequately performing his duties—a topic of public concern.") (citing 261 N.J. at 8) *with id.* ("West Virginia's Daniel's Law has no particular focus on journalism."). The speech at issue is more like the portions of the New York Times that are not inextricably intertwined with journalistic messages (i.e., advertisements), which receive less protection.

Websites like those owned by Defendants-Appellees publish addresses and phone numbers to induce users to purchase services (i.e., subscriptions to Defendants-Appellees' websites) or view advertisements. *See, e.g.*, JA44-46. Courts have repeatedly held that such disclosures constitute commercial speech. *See Kolebuck-Utz v. Whitepages Inc.*, 2021 WL 1575219, at *3 (W.D. Wash. Apr. 22, 2021); *Camacho v. Control Grp. Media Co., LLC*, 2022 WL 3093306, at *19 (S.D.

Cal. July 18, 2022) ("Here, the speech at issue is commercial speech … Plaintiffs' name, identifying information, and likeness is alleged to be used by Defendants for the purpose of enticing users into subscribing to Defendants' services."). Accordingly, at least some speech regulated by Daniel's Law "proposes a commercial transaction" and is commercial speech that is subject to intermediate scrutiny. *Maryland Shall Issue, Inc. v. Anne Arundel Cnty. Maryland*, 91 F.4th 238, 248 (4th Cir. 2024).

Further, "[a] related line of cases has applied an intermediate level of scrutiny, akin to a commercial speech inquiry, to regulations restricting sales of [] data." *People v. Martinez*, 534 P.3d 72, 83 (Cal. 2023). That line of cases begins with *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 751 (1985), in which the Supreme Court "recognized that not all speech is of equal First Amendment importance" and noted that "[i]t is speech on matters of public concern that is at the heart of the First Amendment's protection." 472 U.S. at 758–59 (cleaned up). The Supreme Court concluded that the credit report contained speech on matters of purely private concern and therefore warranted reduced constitutional protection. *Id.* at 762-63. Specifically, the Supreme Court held that the credit report "was speech solely in the individual interest of the speaker and its specific business audience"; that special protection for such credit reporting was not necessary to ensure that "debate on public issues [will] be uninhibited, robust, and wide-open"; and that, like

similarly profit-driven commercial speech, credit reporting was "unlikely to be deterred by incidental state regulation." *Id.* at 762 (cleaned up).

Numerous courts have declined to apply strict scrutiny on this basis. *See, e.g.*, *Brooks v. Thomson Reuters Corp.*, 2021 WL 3621837, at *14-16 (N.D. Cal. Aug. 16, 2021). Thus, "[e]ven if the disclosures" at issue "do not strictly satisfy the definition of commercial speech, [such] speech … is subject to many of the same concerns that argue in favor of reduced constitutional protection for commercial speech." *Saunders v. Hearst Television, Inc.*, 711 F. Supp. 3d 24, 33 n.8 (D. Mass. 2024) (cleaned up). "[Defendants-Appellees'] dossiers with [P]laintiff[-Appellee's] personal information concern [ ] no public issue because [they are] speech solely in the individual interest of the speaker [i.e. Defendants-Appellees] and [their] specific business audience [i.e. Defendants-Appellees' subscribers]." *Brooks*, 2021 WL 3621837, at *15 (cleaned up). "Also, that [Defendants-Appellees] only share[] [P]laintiff[-Appellee's] personal information with [their] [] subscribers who specifically pay for it, and not with the general public, cuts heavily against concluding that [Defendants-Appellees'] conduct is of public concern." *Id.* "If anything, … the speech at issue here is less of the public's concern than the credit report in *Dun*[] *& Bradstreet* because it involves the personal information of private individuals, not incorporated businesses like the respondent in *Dun & Bradstreet*." *Id.* (cleaned up). "And the speech here is 'solely motivated by the desire for profit,'

which 'is a force less likely to be deterred than others,' further counseling in favor of the application of intermediate scrutiny." *Saunders*, 711 F. Supp. 3d at 33 n.8 (quoting *Dun & Bradstreet*, 472 U.S. at 762). Intermediate scrutiny thus applies.

## III. DANIEL'S LAW SATISFIES ANY STANDARD OF REVIEW

### A. Privacy Laws Have Repeatedly Survived First Amendment Challenges

Despite being frequently targeted by data brokers, multiple privacy laws have survived First Amendment challenges, including before the United States Supreme Court.

- Health Information Privacy Protection Act (HIPAA): *Citizens for Health v. Leavitt*, 428 F.3d 167, 184 (3d Cir. 2005).

- (Federal and state) Telephone Consumer Privacy Statutes: *Barr v. Am. Ass'n of Political Consultants*, 591 U.S. 610, 635 (2020); *Nat'l Coal. of Prayer, Inc. v. Carter*, 455 F.3d 783, 789 (7th Cir. 2006) (Indiana's do-not-call list law).

- (Federal and state) Video Rental Protection Statutes: *Boelter v. Hearst Commc'ns, Inc.*, 192 F. Supp. 3d 427, 452 (S.D.N.Y. 2016) (Michigan Video Rental Privacy Act); *Saunders v. Hearst Television, Inc.*, 2024 WL 126186, at *5-6 (D. Mass. January 11, 2024) (federal Video Privacy Protection Act); *Christopherson v. Cinema Entertainment Corp.*, 2024 WL 1120925, at *5 (D. Minn. Mar. 6, 2024) (same).

- (Federal) Fair Credit Reporting Act (FCRA): *King v. Gen. Info. Servs, Inc.*, 903 F. Supp. 2d 303, 313 (E.D. Pa. 2012); *Dun & Bradstreet, Inc.*, 472 U.S. 749, 762.

- Right of Publicity Statutes: *Kellman*, 599 F. Supp. 3d at 899-900 (upholding right of publicity statutes in California, Indiana, Ohio). *Krause*, 561 F. Supp. 3d at 783-84.

For the same reasons courts denied these challenges, the lower court should have denied Defendants-Appellees' motion to dismiss. Daniel's Law is constitutional, given the compelling state interest in protecting Covered Persons' safety.

### B. Daniel's Law Is Neither "Overinclusive" Nor "Overbroad"

The overbreadth doctrine requires that "a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *Americans for Prosperity Found. v. Bonta*, 594 U.S. 595, 615 (2021). That standard is not met here.

#### 1. The Absence of a Notice Requirement Does Not Render the Statute Overinclusive

The lower court compared West Virginia's Daniel's Law with "[t]he federal Daniel Anderl Judicial Security and Privacy Act and the laws of at least nine states, including New Jersey's Daniel's Law, [which] create a private right of action that is only available after a judge, law enforcement officer, or other potential plaintiff has provided notice (usually written notice) to the disclosing entity that they wish to have their information removed from where it is being displayed." JA550. The West Virginia statute is drafted differently; "a disclosing entity would need to obtain written permission **before** properly disclosing any protected person's information." JA552 (emphasis added) (citing W. Va. Code § 5A-8-24(e)). Considering this, Judge Urbanski held that "Section E's lack of a notice requirement [] renders the

provision overinclusive in that it burdens more speech than necessary to protect the safety of judicial and law enforcement officers because it risks chilling even speech unrelated to judicial and law enforcement officers." JA552-553. This is incorrect, and the approach taken by the West Virginia State Legislature is not more restrictive than necessary.

First, although the lower court correctly noted that New Jersey's Daniel's Law requires "notice[] to the disclosing entity that [a Covered Person] wish[es] to have their information removed" (JA550), it ignored that New Jersey's Daniel's Law also provides for the assignment of claims. This is explained by *Atlas*: "The [New Jersey] Legislature … deci[ded to] allow[] covered persons to assign their claims. In its view, it will make the enforcement more effective. It is not hard to imagine that many covered persons may find it too difficult, too cumbersome, or too expensive to hire counsel or to proceed against dozens of defendants on their own without an assignee." *Atlas*, 758 F. Supp. 3d at 339. In other words, legislatures have adopted two approaches: (1) an opt-out regime, combining takedown requests and the assignment of claims (New Jersey); and (2) an opt-in regime (West Virginia).

Either the assignment of claims or an opt-in regime is necessary because data brokers are **<u>innumerable</u>**. Indeed, as highlighted in Plaintiff's briefing below—but left unaddressed by the Order—at least 140 actions have been filed against different data brokers under New Jersey's Daniel's Law. JA364. There is tremendous

difficulty in "notify[ing these] entities, large and small, to refrain from disclosing [] home addresses and unlisted phone numbers[.]" *Atlas*, 758 F. Supp. 3d at 335. It would be essentially impossible for Covered Persons to dig up obscure data brokers that they have never even heard of, send countless notice-and-takedown requests, and navigate labyrinthine processes to ensure compliance. This would pull Covered Persons away from their public duties and come at the cost of their time, mental wellbeing, and—worst of all—the chance of missing a website that a malefactor does not miss.

Second, by the time a takedown request is made (and seen through), it is arguably "too late"—a Covered Person's personal information has already been published and/or misappropriated, putting them in harm's way. The New Jersey Daniel's Law lawsuits—all against defendants that allegedly failed to comply in a timely fashion with public officials' takedown requests—underscore this point, which the lower court did not address. Conversely, West Virginia's Daniel's Law provides the real-time protection required by Covered Persons, rather than post hoc relief after disclosure. **Tragedy offers no pause for the slow march of a lawsuit; it strikes swiftly, and neither a court order nor any amount of compensation can return it to Pandora's Box**.

Relatedly, Judge Urbanski noted: "West Virginia's law [] places the burden on the would-be speaker to overcome the impediment to speech, rather than placing

the burden on those who would like to advance a countervailing interest in safety. This is constitutionally problematic because the free flow of speech ought to … trump[] competing unenumerated governmental interests." JA552. But the West Virginia government's interest is far from unenumerated. True, it is not a purely pecuniary interest reducible to a certain number of dollars and cents, after a lawsuit is won. It is an interest in the day-to-day safety of West Virginia's Covered Persons and their families, within their homes.

"[T]he homes of men, sometimes the last citadel of the tired, the weary and the sick, can be protected by government from noisy, marching, tramping, threatening picketers and demonstrators bent on filling the minds of men, women, and children with fears of the unknown." *Gregory v. City of Chicago*, 394 U.S. 111, 125–26 (1969) (Black, J., concurring). While the threatening picketers of Justice Black's era stood on the sidewalk, today's data brokers strip away the citadel's walls entirely, leaving Covered Persons perpetually exposed to the very 'fears of the unknown' that the State has a compelling interest to prevent. *See also F.C.C. v. Pacifica Found.*, 438 U.S. 726, 748 (1978) ("[I]n the privacy of the home, [] the individual's right to be left alone plainly outweighs the First Amendment rights of an intruder.") (citation omitted). Indeed, "[the U.S. Supreme Court has] repeatedly recognized the interests of unwilling listeners in situations where the degree of captivity makes it impractical for the unwilling viewer or auditor to avoid exposure."

*Hill v. Colorado*, 530 U.S. 703, 718 (2000) (cleaned up). Residents are a captive audience with little or no ability to avoid unwanted speech directed toward them. *See, e.g.*, *Frisby v. Schultz*, 487 U.S. 474, 484-85 (1988); *FCC v. Pacifica Found.*, 438 U.S. at 748-749; *Kovacs v. Cooper*, 336 U.S. 77, 86-87 (1949).[6]

The West Virginia legislature recognized this and the fact that "[p]erhaps no one is more of a captive audience than one who is … an unknowing audience[.] [T]hey have even less control tha[n] the unwilling audience. The listeners or viewers don't know if they are willing to receive the [] message because they are unaware that it exists." *Vance v. Judas Priest*, No. 86-3939, 1990 WL 130920, at *32 (Nev. Dist. Ct. Aug. 24, 1990). Thus, just as the Supreme Court did in *FCC v. Pacifica Found.* (concerning unwilling listeners that the defendant proposed could simply turn off the radio), this Court must reject the argument that "the remedy for an assault is to run away after the first blow." 438 U.S. at 749. After the first blow is too late.

The proper remedy is for Defendants-Appellees to comply with Daniel's Law. On this point, the lower court held, "[w]ithout a notice requirement, it is difficult to imagine how anyone wishing to speak widely on the topic of home addresses and

[6] The captive audience doctrine has also been applied to other instances outside of the home. *See Lehman v. City of Shaker Heights*, 418 U.S. 298, 303–304 (1974) (plurality opinion) (explaining that public transit riders are a "captive audience" unable to easily avoid advertisements when commuting); *Berger v. City of Seattle*, 569 F.3d 1029, 1054 (9th Cir. 2009) (finding a substantial privacy interest exists in "the psychological [and] physical well-being of the [hospital] patient held 'captive' by medical circumstance.").

phone numbers could know exactly which home addresses and phone numbers belong to potential West Virginia's Daniel's Law plaintiffs." JA553. But "[a] statute need not provide 'perfect clarity and precise guidance,' so long as its 'prohibitions are set out in terms that the ordinary person exercising ordinary common sense can sufficiently understand and comply with.'" *United States v. Anderson*, 700 F. App'x 190, 192 (4th Cir. 2017) (quoting *United States v. Shrader*, 675 F.3d 300, 310 (4th Cir. 2012)). This is true of Daniel's Law. And, in any event, Defendants-Appellees can identify Covered Persons via public records. *See, e.g.*, W. Va. Code § 29B-1-1, *et seq.* (West Virginia Freedom of Information Act); W. Va. Code § 21-5C-5 (West Virginia payroll records law); *In re Charleston Gazette FOIA Request*, 222 W. Va. 771, 783 n.4 (2008) (listing documents related to public employees that are subject to disclosure); *Farley v. Worley*, 215 W.Va. 412, 599 (2004) ("a public body has a duty to redact or segregate exempt from non-exempt information[.]"). Still, Defendants-Appellees do not even suggest that they so much as **attempted** in good faith to comply with the law.

#### 2. The Absence of a Knowledge Requirement Does Not Render the Statute Overinclusive

The lower court held, "even beyond its lack of a notice requirement, Section E of West Virginia's Daniel's Law lacks another important, albeit related, speech-protective limit on liability[:] … a knowledge requirement." JA555. The Order noted, "[t]he Supreme Court has specifically recognized the tendency of statutes

restricting speech without a knowledge requirement to exert a chilling effect." *Id.* Judge Urbanski reasoned, "those wishing to comply with West Virginia's Daniel's Law will face the burden of inspecting their speech for any content that might fall within the scope of West Virginia's Daniel's Law. As was the case with booksellers, this is a potentially insurmountable task[.]" JA556. This is incorrect.

Judge Bartle, analyzing New Jersey's Daniel's Law, likewise recognized the point that liability following automatically from defendants' disclosure could prove problematic. *See Atlas*, 758 F. Supp. 3d 322, 340. With this in mind, "[t]he standard for determining culpability under Daniel's Law for actual or liquidated damages is of course a matter of state law." *Id.* (citing *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938)). And even if Daniel's Law was silent on the applicable standard, "statutes must be construed to conform to the Constitution if the statute is reasonably susceptible to such a construction." *Id.* (cleaned up); *see also Cottrill v. Ranson*, 200 W. Va. 691, 698 (W. Va. 1997) ("[w]herever an act of the Legislature can be so construed and applied as to avoid a conflict with the Constitution, and give it the force of law, such construction will be adopted by the courts.") (cleaned up).

Here, W. Va. Code § 5A-8-24(e) explicitly only applies liability "under circumstances in which a **reasonable person** would believe that providing [home addresses or telephone numbers of Covered Persons] would expose another to harassment or risk of harm to life or property." (emphasis added). Far from

prohibiting *any* disclosure of *any* address or phone number online, this objective standard narrowly tailors the law to address the discrete circumstances of import to the State. *See Yarborough v. Alvarado*, 541 U.S. 652, 673-74 (2004) ("the law has introduced the concept of a 'reasonable person' to avoid judicial inquiry into subjective states of mind."); *United States v. Yengel*, 711 F.3d 392, 397 (4th Cir. 2013) ("An objectively reasonable belief must be based on specific articulable facts and reasonable inferences that could have been drawn therefrom.") (cleaned up); *State v. VanBuren*, 210 Vt. 293, 323–24 (2019), *as supplemented* (June 7, 2019) ("the statute is duly narrowly tailored. … [T]he disclosure must be one that would cause a reasonable person 'physical injury, financial injury, or serious emotional distress.' … The statute is not designed to protect overly fragile sensibilities[.]") (emphasis in original) (citation omitted).

A reasonable person—considering the specific, relevant facts at issue—would believe that Defendants-Appellees' unauthorized provision of Covered Persons' personal information would expose them to harassment or risk of harm to life or property. This may not be so for every act of disclosure. That this is so supports a finding that Daniel's Law is narrowly tailored.

There are "many reasons why Defendant[s-Appellees'] product[s are] so dangerous." JA67. "First, Defendant[s-Appellees'] search function requires very little information about a person of interest to, in turn, return a great deal of

contextual information needed to precisely identify someone[.] … This can be used to single out a particular covered person." *Id.* "Second, Defendant[s-Appellees] 'redisclose[]' – aggregate[] and package[] – myriad pieces of information, all in one place. This facilitates quickly and conveniently profiling victims, allowing bad actors to compile dossiers that can be used to physically track down and/or emotionally/mentally target victims (i.e., with personally-tailored fraud, scams, telephone or online harassment, etc.)." *Id.* "Third, Defendant[s-Appellees] make[] available telephone numbers. This is conducive to telephone harassment, scam calls, and threats to digital safety/cybersecurity." JA68. "Fourth, Defendant[s-Appellees'] advertisements … entice people (including potential bad actors) to locate protected, sensitive information. Defendant[s-Appellees'] ads call attention to the availability of this information, generate and/or kindle interest in it[.]" *Id.* "This means that a bad actor – acting on impulse, with virtually no forethought – could make a one-second decision to click on one of Defendant[s-Appellees'] ads and suddenly tumble down the rabbit hole that is [a people search service] (with catastrophic consequences)." *Id.* Fifth, "Plaintiff[-Appellant] has no relationship with Defendant[s-Appellees] whatsoever. Plaintiff[-Appellant] had never heard of Defendant[s-Appellees] and had no reasonable ability to discover [their] use of his personal information until shortly before filing suit." JA66.

Thus, Defendants-Appellees expose Covered Persons to harassment or risk of

harm to life or property. The Federal Trade Commission agrees. JA66-67. History shows these risks are pronounced and pervasive. "Roy Den Hollander targeted Judge Esther Salas and killed her son, Daniel Anderl, in July 2020." JA68. "In 1999, investigation firm Docusearch provided information to a man who used it to track down a New Hampshire woman named Amy Boyer, shoot her to death, and then kill himself. When Boyer's mother sued the company, a judge determined that data brokers could be held responsible[.]" JA70. And "[m]any cases of stalking and gendered violence have occurred in the ensuing years where the abusive individuals have acquired data from people search data brokers." JA71.

"As [] compan[ies] that market[ ] these people search products, Defendant[s-Appellees] ha[ve] knowledge about th[ese risks]." JA67. Still, Defendants-Appellees failed to follow the simple Daniel's Law directive: Forgo unauthorized disclosures of Covered Persons' personal information "under circumstances in which a reasonable person would believe that providing such information would expose another to harassment or risk of harm to life or property." W. Va. Code § 5A-8-24(e).

### C. Daniel's Law Is Not Underinclusive

The lower court did not address Defendants-Appellees' argument that Daniel's Law is "unlawful because it is underinclusive"—i.e., by "cover[ing] too little speech, thereby … not actually advanc[ing] [the state's] interest to a material

degree." JA294 (cleaned up). However, the Supreme Court has long held that "the First Amendment imposes no freestanding 'underinclusiveness limitation.'" *Williams-Yulee v. Florida Bar*, 575 U.S. 433, 449 (2015). "A State need not address all aspects of a problem in one fell swoop; policymakers may focus on their most pressing concerns." *Id.* And the Court has "upheld laws—even under strict scrutiny—that conceivably could have restricted even greater amounts of speech in service of their stated interests." *Id.*

Underinclusiveness can justify invalidating a statute in two circumstances: first, when underinclusiveness shows "the government is [not] in fact pursuing the interest it invokes, rather than disfavoring a particular speaker or viewpoint," and second, when underinclusiveness "reveal[s] that a law does not actually advance a compelling interest." *See Williams-Yulee*, 575 U.S. at 448-49. Neither circumstance is present. Defendants-Appellees conceded the law is not viewpoint discriminatory. *See* JA283 (arguing Daniel's Law is content based, "even [though] it does not discriminate among viewpoints") (cleaned up). Nor is the statute "riddled with exceptions" preventing it from advancing the State's interests. *Williams-Yulee*, 575 U.S. at 448-49.

Still, Defendants-Appellees argued that Daniel's Law is underinclusive for three reasons: "For government actors, Daniel's Law (1) bars only "'knowing[]' violations, (2) provides no means of enforcing the law, and (3) exempts huge

amounts of disclosure from coverage in the first place." JA294. Concerning point (2), nothing in Daniel's Law suggest that it is intended to override the common law right to seek to "enjoin[] the Secretary [of State or other public agencies] from disclosing to the public certain information[.]" *Hechler v. Casey*, 175 W. Va. 434, 438 (1985); *see also Haislop v. Edgell*, 215 W. Va. 88, 89 (W. Va. 2003) (in which "[a]ppellants challenge[d] the state's active, public disclosure of personal information"). With respect to point (3), the Legislature has enacted 81 separate statutes exempting material from FOIA disclosure.[7] *See also* W. Va. Code § 5A-8-21 and W. Va. Code § 29B-1-4 (with 19 categories of exemption). And New Jersey's law, with even broader exceptions, was not found underinclusive. *See Atlas*, 758 F. Supp. 3d at 338 ("The law, for example, does not block access to home addresses which appear on property records or on voter registration lists.").

More crucially, Daniel's Law is tailored to the unique concerns surrounding public and private disclosures of Covered Persons' personal information. Thus, it contemplates government disclosures made "knowingly" (W. Va. Code § 5A-8-24(d)) and private disclosures made "under circumstances in which a reasonable person would believe that providing such information would expose another to harassment or risk of harm to life or property." W. Va. Code § 5A-8-24(e). This

---

[7] JA366 (citing https://privacy.wv.gov/SiteCollectionDocuments/Intersection%20of%20FOIA%20and%20Privacy/FOIA%20Handbook%20PDF.pdf at p. 26).

was not done arbitrarily, and it does not render the statute underinclusive. Rather, the State has a strong interest in "preventing the diversion of official energy from pressing public issues, [] the deterrence of able citizens from acceptance of public office[,] and the danger that the fear of being sued will dampen the ardor of all but the most resolute, or the most irresponsible [public officials], in the unflinching discharge of their duties." *In re Allen*, 119 F.3d 1129, 1131 (4th Cir. 1997) (cleaned up). In other words, the limitation on "knowing[]" government disclosures advances the overall end of Daniel's Law, which is "to foster the ability of [] public servants who perform critical roles in the justice system, and to carry out their official duties[.]" W. Va. Code § 5A-8-24(b).

This reflects the marked differences between governmental and private disclosures of Covered Persons' personal information. Defendants-Appellees argued this "is a paradigm example of underinclusiveness: [W]here the government has made certain information publicly available, it is highly anomalous to sanction persons other than the source for its release." JA295 (cleaned up). But, as discussed *supra* and recognized by Judge Bartle, "[t]he Supreme Court has emphasized that the right of privacy in compiled or computerized information does not evaporate simply because the information may be found in other places." *Atlas*, 758 F. Supp. 3d at 338. And "[e]ven under strict scrutiny, '[t]he First Amendment does not require States to regulate for problems that do not exist.'" *Williams-Yulee*, 575 U.S.

at 451 (cleaned up).

Indeed, public records are far less accessible than information posted on websites that render such information easily searchable by any user or member of the general public. Defendants-Appellees offer no reason to think that the traditional availability of home addresses in public records presents anything close to the risks associated with easy, aggregated, curated, and widespread access. *See, e.g.*, JA53-54 ("government sources of public records offer comparatively less robust, less straightforward search functions that require more pieces of information to prove useful. Government search functions return results with little contextual information that can be pieced together to single out a person."); JA54 ("If one were to search government sources of public records for these pieces of information (to the extent they are even available), it would take far longer. On information and belief, the government does not aggregate this information in one place for the public to view.").

Moreover, "the government does not disclose, redisclose, or otherwise make available unpublished home or personal telephone numbers." JA57. Defendants-Appellees do. *See* JA55. "This is conducive to telephone harassment, scam calls, and threats to digital safety/cybersecurity." JA68. And Defendants-Appellees "advertise" Covered Persons' personal details (JA57-61), while "the government does not[.]" JA61-65. This is despite Daniel's Law defining "disclose" to include

"advertise." W. Va. Code § 5A-8-24(c)(1). It is also despite such conduct being profoundly dangerous. JA68.

Further, Defendants-Appellees' underinclusiveness argument overlooked West Virginia's legitimate basis for treating redaction of public records differently from the redaction of private records. West Virginia's public agencies provide substantial and important services to their constituents, including Covered Persons, in exchange for their constituents' tax dollars. And certain rights, duties, and obligations are affected by the government's records. *See, e.g.*, N.J. Stat. § 47:1B-2(d) (describing, *inter alia*, "the receipt of certain notices[;]" "the sale or purchase of a home or other property, recordation of a judgment, lien or other encumbrance on real or other property, and any relief granted based thereon;" and "the ability to be notified of any class action suit or settlement[.]"). Conversely, Covered Persons receive no benefit whatsoever from Defendants-Appellees' websites. Therefore, the Legislature's choice to treat public records differently from Defendants-Appellees' disclosures makes eminent sense and demonstrates that the law is not underinclusive.

## IV. DEFENDANTS-APPELLEES' FACIAL VAGUENESS CHALLENGE IS MERITLESS

The lower court did not address Defendants-Appellees vagueness challenge, but if this Court does address this argument, it should be rejected.

As an initial matter, Defendants-appellees' vagueness challenge did not belong in the motion to dismiss, which the lower court limited to facial First

Amendment challenges. JA118-119. "Vagueness doctrine is an outgrowth not of the First Amendment, but of the Due Process Clause." *United States v. Williams*, 553 U.S. 285, 304 (2008); *see also Holder v. Humanitarian Law Project*, 561 U.S. 1, 19 (2010) ("[T]he lower court" erred by "merg[ing] plaintiffs' vagueness challenge with their First Amendment claims.").

Ignoring this, Defendants-Appellees argued below that Daniel's Law is unconstitutionally vague because it "imposes liability only when someone discloses covered information 'under circumstances in which a reasonable person would believe that providing such information would expose another to harassment or risk of harm to life or property.'" JA307 (citing W. Va. Code § 5A-8-24(e)). But this is absurd because the statute relies upon the reasonable person standard. *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, n.7 (1982) (laws are not void for vagueness where they contain "an imprecise but comprehensible normative standard"). Thus, "because the relevant standard of behavior is dictated by the objective reasonable person standard, … [Daniel's Law] ordinance is not unconstitutionally vague. *Shook v. City of Lincolnton*, 2019 WL 4145709, at *7 (W.D.N.C. Aug. 29, 2019).

Regardless, Defendants-Appellees' facial vagueness challenge would fail even without this obvious flaw. A statute "fails to comport with due process" under the vagueness doctrine if it "fails to provide a person of ordinary intelligence fair

notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *Holder*, 561 U.S. at 18. To prevail on a facial vagueness challenge, defendants must prove "the enactment is impermissibly vague in all of its applications." *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 495 (1982). Defendants-Appellees do not come anywhere close to satisfying this standard. But even if Defendants-Appellees could find some vagueness in the law, they do not (and could not) question that Daniel's Law includes, and is primarily aimed at internet publication. W. Va. Code Ann. § 5A-8-24(c)(1) ("Disclose" means to publish, publicly display, distribute, deliver, circulate, post, lend, provide, advertise, or disseminate by any means including, but not limited to, electronic transmission and on any medium including, but not limited to, **the Internet**.) (emphasis added). Because Defendants-Appellees all engaged in such publication, it follows that this challenge fails. *See, e.g.*, JA38; *Holder*, 561 U.S. at 20 (a party "who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others.").

Additionally, as explained above, the traditional tools of statutory construction clearly limit the statute's reach to very specific conduct: (i) publication; of (ii) certain commercial transactions involving the home addresses and unpublished home telephone numbers of Covered Persons; and (iii) under circumstances in which a reasonable person would believe that providing such

information would expose another to harassment or risk of harm to life or property. This makes it hard to argue that persons of ordinary intelligence cannot determine what conduct Daniel's Law proscribes.

Finally, the alleged risk of "arbitrary" enforcement is not an issue when addressing a statute that grants individual persons a right to control how others use their information, as opposed to a civil or criminal statute enforced by the government. Daniel's Law simply allows Covered Persons to decide when and how to exercise their rights under the statute to protect their own interests.

## V. REGARDLESS, DANIEL'S LAW MEETS THE STRICT SCRUTINY TEST BECAUSE EVEN DEFENDANTS-APPELLEES DO NOT DISPUTE THAT IT PROTECTS AGAINST THE OCCUPATIONAL HAZARDS FACED BY COVERED PERSONS

In upholding a Colorado ordinance, the Supreme Court recognized that "the States' 'police powers to protect the health and safety of their citizens'" may be sufficient to override First Amendment challenges. *Hill v. Colorado*, 530 U.S. at 715. In cases where the First Amendment has met the compelling interest of people's safety, lower courts have likewise followed the same reasoning. *See Capra v. Thoroughbred Racing Ass'n of N. Am., Inc.*, 787 F.2d 463, 464 (9th Cir. 1986) (speech revealing "former identity and location" of person in witness-protection program was not protected by First Amendment); *see also Hyde v. City of Columbia*, 637 S.W.2d 251, 254 (Mo. Ct. App. 1982). This is in line with the reason why a long-time exception to First Amendment challenges has been instances of "true

threats" to the safety of individuals. *See Counterman v. Colorado*, 600 U.S. 66, 72 (2023) ("True threats of violence … lie outside the bounds of the First Amendment's protection."). In *Hill v. Colorado*, for example, the Supreme Court upheld the state ordinance designed to protect the safety of persons visiting abortion clinics. 530 U.S. at 716. Here, Defendants-Appellees do not dispute that Daniel's Law protects the safety of the Covered Persons, and that it was enacted with that purpose in mind. Failing to raise any real dispute as to whether Daniel's Law advances a compelling interest and likewise failing to provide any real alternative to do the same, Defendants-Appellees' facial challenge cannot even be saved by the application of strict scrutiny.

## CONCLUSION

For the reasons discussed above, Plaintiff-Appellant asks this Court to overturn the lower court's decision and find Daniel's Law facially valid under the First Amendment.

## REQUEST FOR ORAL ARGUMENT

Pursuant to Fed. R. App. P. 34(a)(1), Plaintiff-Appellant respectfully requests oral argument. Oral argument will assist the Court in resolving novel issues regarding the facial validity of Daniel's Law under the First Amendment.

Dated: January 8, 2026

Respectfully submitted,

**BURSOR & FISHER, P.A.**

By: */s/ Philip L. Fraietta*
Philip L. Fraietta
50 Main Street, Suite 475
White Plains, NY 10106
Telephone: (914) 874-0710
Facsimile: (914) 206-3656
E-Mail: pfraietta@bursor.com

**BURSOR & FISHER, P.A.**
Julian C. Diamond
1330 Avenue of the Americas, 32nd Floor
New York, NY 10019
Telephone: (646) 837-7150
Facsimile: (212) 989-9163
E-Mail: jdiamond@bursor.com

**BORDAS & BORDAS, PLLC**
Jason E. Causey
1358 National Road
Wheeling, WV 26003
Telephone: (304) 242-8410
E-Mail: jcausey@bordaslaw.com

*Counsel for Plaintiff and the Putative Class*

## UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**No.** 25-2121 **Caption:** Michael Jackson v. Thomson Reuters America Corporation

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT

Type-Volume Limit, Typeface Requirements, and Type-Style Requirements

**Type-Volume Limit for Briefs if Produced Using a Computer:** Appellant's Opening Brief, Appellee's Response Brief, and Appellant's Response/Reply Brief may not exceed 13,000 words or 1,300 lines. Appellee's Opening/Response Brief may not exceed 15,300 words or 1,500 lines. A Reply or Amicus Brief may not exceed 6,500 words or 650 lines. Amicus Brief in support of an Opening/Response Brief may not exceed 7,650 words. Amicus Brief filed during consideration of petition for rehearing may not exceed 2,600 words. Counsel may rely on the word or line count of the word processing program used to prepare the document. The word-processing program must be set to include headings, footnotes, and quotes in the count. Line count is used only with monospaced type. See Fed. R. App. P. 28.1(e), 29(a)(5), 32(a)(7)(B) & 32(f).

**Type-Volume Limit for Other Documents if Produced Using a Computer:** Petition for permission to appeal and a motion or response thereto may not exceed 5,200 words. Reply to a motion may not exceed 2,600 words. Petition for writ of mandamus or prohibition or other extraordinary writ may not exceed 7,800 words. Petition for rehearing or rehearing en banc may not exceed 3,900 words. Fed. R. App. P. 5(c)(1), 21(d), 27(d)(2) & 40(d)(3).

**Typeface and Type Style Requirements:** A proportionally spaced typeface (such as Times New Roman) must include serifs and must be 14-point or larger. A monospaced typeface (such as `Courier New`) must be 12-point or larger (at least 10½ characters per inch). Fed. R. App. P. 32(a)(5), 32(a)(6). Sans-serif type, such as Arial, may not be used except in captions and headings.

This brief or other document complies with type-volume limits because, excluding the parts of the document exempted by Fed. R. App. R. 32(f) (cover page, disclosure statement, table of contents, table of citations, statement regarding oral argument, signature block, certificates of counsel, addendum, attachments):

- [✓] this brief or other document contains 12,991 [*state number of*] words
- [ ] this brief uses monospaced type and contains ____________ [*state number of*] lines

This brief or other document complies with the typeface and type style requirements because:

- [✓] this brief or other document has been prepared in a proportionally spaced typeface using Microsoft Word [*identify word processing program*] in Times New Roman, 14, Plain [*identify font, size, and type style*];

**or**

- [ ] this brief or other document has been prepared in a monospaced typeface using ____________ [*identify word processing program*] in ____________ [*identify font, size, and type style*].

**NOTE: The Court's preferred typefaces are Times New Roman, Century Schoolbook, and Georgia. The Court discourages the use of Garamond.**

(s) Philip L. Fraietta

Party Name Michael Jackson Date: 01/08/2026