No. 25-2121(L)

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

MICHAEL JACKSON, on behalf of himself and all others similarly situated,

*Plaintiff-Appellant,*

– v. –

THOMSON REUTERS AMERICA CORPORATION,

*Defendant-Appellee.*

On Appeal from the United States District Court for the Northern District of West Virginia at Clarksburg, No. 1:24-cv-00088-MFU (Hon. Michael F. Urbanski)

**PROPOSED BRIEF OF AMICI CURIAE REPORTERS COMMITTEE FOR FREEDOM OF THE PRESS AND OTHER NEWS AND MEDIA ORGANIZATIONS IN SUPPORT OF DEFENDANT-APPELLEE SUPPORTING AFFIRMANCE**

Mara Gassmann
   *Counsel of Record*
Lisa Zycherman
Gabriel Rottman*
Matthew Singer*
THE REPORTERS COMMITTEE FOR
   FREEDOM OF THE PRESS
1156 15th St. NW, Suite 1250
Washington, D.C. 20005
(202) 795-9300

*Counsel block continued on next page*

Ian Kalish\*
UNIVERSITY OF VIRGINIA LAW SCHOOL
     FIRST AMENDMENT CLINIC
580 Massie Road
Charlottesville, VA 22903
(202) 795-9316

\* *Of counsel*

*Counsel for amici curiae*

# CORPORATE DISCLOSURE STATEMENTS

Pursuant to Federal Rule of Appellate Procedure 26.1, amici certify as follows:

The Reporters Committee for Freedom of the Press is an unincorporated association of reporters and editors with no parent corporation and no stock.

The Associated Press is a global news agency organized as a mutual news cooperative under the New York Not-For-Profit Corporation law. It is not publicly traded.

The Center for Investigative Reporting, Inc. is a California non-profit public benefit corporation that is tax-exempt under section 501(c)(3) of the Internal Revenue Code. It has no statutory members and no stock.

First Amendment Coalition is a nonprofit organization with no parent company. It issues no stock and does not own any of the party's or amicus' stock.

The Intercept Media, Inc., publisher of The Intercept, is a non-profit non-stock corporation. It has no parent, subsidiaries, or affiliates.

The International Documentary Association is a not-for-profit organization with no parent corporation and no stock.

The Media Institute is a 501(c)(3) non-stock corporation with no parent corporation.

National Press Photographers Association is a 501(c)(6) nonprofit organization with no parent company. It issues no stock and does not own any of the party's or amicus' stock.

National Public Radio, Inc. is a privately supported, not-for-profit membership organization that has no parent company and issues no stock.

The New York Times Company is a publicly traded company and has no affiliates or subsidiaries that are publicly owned. No publicly held company owns 10% or more of its stock.

News/Media Alliance represents the newspaper, magazine, and digital media industries, including nearly 2,200 diverse news and magazine publishers in the United States and internationally. It is a nonprofit, non-stock corporation organized under the laws of the commonwealth of Virginia. It has no parent company.

Pro Publica, Inc. ("ProPublica") is a Delaware nonprofit corporation that is tax-exempt under section 501(c)(3) of the Internal Revenue Code. It has no statutory members and no stock.

Radio Television Digital News Association is a nonprofit organization that has no parent company and issues no stock.

The Seattle Times Company: The McClatchy Company, LLC owns 49.5% of the voting common stock and 70.6% of the nonvoting common stock of The Seattle Times Company.

The Society of Environmental Journalists is a 501(c)(3) non-profit educational organization.  It has no parent corporation and issues no stock.

Student Press Law Center is a 501(c)(3) not-for-profit corporation that has no parent and issues no stock.

The Tully Center for Free Speech is a subsidiary of Syracuse University.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENTS......................................................i

TABLE OF CONTENTS............................................................... iv

TABLE OF AUTHORITIES .............................................................v

INTEREST OF AMICI CURIAE .......................................................1

SOURCE OF AUTHORITY TO FILE ................................................3

FED. R. APP. P. 29(a)(4)(E) STATEMENT.........................................3

SUMMARY OF ARGUMENT .......................................................4

ARGUMENT ...............................................................................6

    I.    The First Amendment protects the press's editorial autonomy and the ability of journalists to decide when information is in the public interest. ......................6

    II.    Daniel's Law, which would suppress truthful facts on matters of public concern and create traps for the unwary, could chill news reporting and cannot survive constitutional scrutiny..............................................................15

CONCLUSION ...........................................................................21

CERTIFICATE OF COMPLIANCE ................................................22

ADDENDUM ............................................................................22

CERTIFICATE OF SERVICE ......................................................23

# TABLE OF AUTHORITIES

**Cases**

*Atlas Data Priv. Corp. v. We Inform, LLC,*
758 F. Supp. 3d 322 (D.N.J. 2024)...................................................................18

*Brayshaw v. City of Tallahassee,*
709 F. Supp. 2d 1244 (N.D. Fla. 2010) .............................................................16

*Columbia Broad. Sys., Inc. v. Democratic Nat't Comm.,*
412 U.S. 94 (1973)..............................................................................................8

*Cox Broad. Corp. v. Cohn,*
420 U.S. 469 (1975) ..........................................................................................16

*Fla. Star v. B.J.F.,*
491 U.S. 524 (1989) ..................................................................................... 15, 17

*In re Murphy-Brown, LLC,*
907 F.3d 788 (4th Cir. 2018)............................................................................13

*Kratovil v. City of New Brunswick,*
336 A. 3d 201 (N.J. 2025)................................................................................19

*Miami Herald Publ'g Co. v. Tornillo,*
418 U.S. 241 (1974)..........................................................................................6, 7

*Mills v. Alabama,*
384 U.S. 214 (1966)............................................................................................4

*Minneapolis Star & Trib. Co. v. Minn. Comm'r of Revenue,*
460 U.S. 575 (1983) ...........................................................................................4

*Ostergren v. Cuccinelli,*
615 F.3d 263 (4th Cir. 2010) ....................................................................... 16, 18

*People for the Ethical Treatment of Animals, Inc. v. N.C. Farm Bureau Fed'n, Inc.,*
60 F.4th 815 (4th Cir. 2023)............................................................................14

*Richmond Newspapers, Inc. v. Virginia,*
448 U.S. 555 (1980)............................................................................................4

*Sheehan v. Gregoire*,
  272 F. Supp. 2d 1135 (W.D. Wash. 2003) ........................................16

*Smith v. Daily Mail Publ'g Co.*,
  443 U.S. 97 (1979) ................................................................ 14, 15, 17

*Soderberg v. Carrion.*,
  999 F.3d 962 (4th Cir. 2021)................................................... 17, 18

*United States v. Stevens*,
  559 U.S. 460 (2010) ....................................................................5

**Statutes**

W. Va. Code § 5A-8-24 ..................................................... 4, 6, 18, 20

**Other Authorities**

Associated Press, *Michigan Justice on Hot Seat Over House Transfers*, Mich. Live
  (May 11, 2012),
  https://perma.cc/CM6D-J4UJ ....................................................9

Associated Press, *Michigan Supreme Court Justice Diane Hathaway Charged
  With Fraud*, Mich. Live (Jan. 19, 2013),
  https://perma.cc/ZVF6-KSXU .................................................9

Brian Slodysko, *Texas Attorney General Ken Paxton, a Senate Hopeful,
  Claimed 3 Homes as his Primary Residence*, A.P., (July 24, 2025),
  bit.ly/3YZwlLm.......................................................................12

Courtney Hessler, *Jury Finds Hardin Guilty of One Rape, Not Guilty on Other
  Charges*, The Herald-Dispatch (Aug. 17, 2020),
  bit.ly/4aXQMxC.......................................................................8

Dan Noyes, *Exclusive: Millbrae Police Chief Facing Questions for Allegedly
  Commuting to Work from Idaho*, ABC7 News (Oct. 27, 2025) ),
  https://perma.cc/VL2X-PFGR................................................ 10, 11

Daniel Boguslaw, *Samuel Alito's Wife Leased Land To An Oil and Gas Firm
  While The Justice Fought The EPA*, The Intercept (June 26, 2023),
  bit.ly/4sZbsh1 .........................................................................12

David E. Sanger, *Leaning on Journalists and Targeting Sources, for 50 Years*, N.Y. Times (June 9, 2021), https://perma.cc/4HBF-72W4 .................................................................8

*Garth Brooks Names His Rape Accuser and Says He's 'Victim of a Shakedown,'* NBC News (Oct. 9, 2024), bit.ly/4b7vm1j ...........................................................................................7

Glenn Kessler, *Tommy Tuberville: Florida's Third Senator?*, Wash. Post (Aug. 10, 2023), bit.ly/45uyKBm .......................................................................................11

Jessica Parks, *Judge Berry, Ordered to Pay $180,000 in Damages, is Retiring*, Phila. Inquirer (Sept. 28, 2012), https://perma.cc/F4HE-GEE8 .................................................................13

John Dougherty, *Sheriff Joe's Real Estate Game*, Phx. New Times (July 1, 2004), bit.ly/4qG2XWy ........................................................................................13

John Lynch, *WV State Police Investigation: 72 New Lawsuits Allege Sexual Misconduct, List Whistleblower as Defendant*, WBOY (Feb. 27, 2024), bit.ly/47iAWN9 .........................................................................................7

Justin Elliot, et al., *Trump's Own Mortgages Match His Own Description of Mortgage Fraud, Records Reveal*, ProPublica (Dec. 8, 2025), https://perma.cc/N6R9-D5ZC .................................................................12

Justin Elliott, et al., *Billionaire Harlan Crow Bought Property from Clarence Thomas. The Justice Didn't Disclose the Deal*, ProPublica (Apr. 13, 2023), https://perma.cc/R2VX-5VMD .................................................................10

Margie Mason & Robin McDowell, *Prison Work Assignments Used to Lure and Rape Female Inmates. Guards Sometimes Walk Free*, Associated Press (Oct. 31, 2024), bit.ly/40S5D89 .........................................................................................8

Press Release, U.S. Department of Justice, Former Michigan Supreme Court Justice Diane Marie Hathaway Sentenced On Bank Fraud Charge (May 28, 2013), https://perma.cc/W9R9-ENAN .................................................................10

Ross Jones, *Did a Michigan Supreme Court Justice Play a Shell Game to Get Out from Her Underwater Home?*, WXYZ-TV (May 9, 2012), https://perma.cc/JT4W-6BJR ..........................................................................9

**Constitutional Provisions**

U.S. Const. Art. 1 § 3 ..............................................................................11

## INTEREST OF AMICI CURIAE

Amici are the Reporters Committee for Freedom of the Press ("Reporters Committee"), The Associated Press, The Center for Investigative Reporting, First Amendment Coalition, The Intercept Media, Inc., International Documentary Association, The Media Institute, National Press Photographers Association, National Public Radio, Inc., The New York Times Company, News/Media Alliance, Pro Publica, Inc., Radio Television Digital News Association, The Seattle Times Company, Society of Environmental Journalists, Student Press Law Center, and Tully Center for Free Speech (together, "amici"). Amici are news and media organizations that have an interest in the continued vitality of legal and constitutional protections for gathering and publishing truthful information on matters of public concern. Amici submit this brief to underline the unintended but significant impacts that the West Virginia's Daniel's Law statute would, if upheld, have on the ability of the press to do its job and the public's ability to access newsworthy information related to public officials.

Lead amicus, the Reporters Committee, is an unincorporated nonprofit association dedicated to defending the First Amendment and newsgathering rights of the press. It was founded by leading journalists and media lawyers in 1970 when the nation's news media faced an unprecedented wave of

government subpoenas forcing reporters to name confidential sources.  Today, its attorneys provide pro bono legal representation, amicus curiae support, and other legal resources to protect First Amendment freedoms and the newsgathering rights of journalists.  The Reporters Committee regularly participates as amicus in federal and state courts, and has filed judicial briefs and legislative correspondence concerning federal and state Daniel's Law legislation.  *See, e.g.*, Amici Curiae Br. of the Rep. Comm. for Freedom of the Press, et al., *Kratovil v. City of New Brunswick*, 336 A.3d 201 (N.J. 2025); Ltr. from Rep. Comm. for Freedom of the Press to U.S. Senators, Jul 20, 2023, https://www.rcfp.org/wp-content/uploads/2023/07/2023-07-20-Senate-Amendment-218-letter-to-U.S.-Senate-sent-by-RCFP-and-30-media-organizations.pdf.

## SOURCE OF AUTHORITY TO FILE

Appellees consent to the filing of this amici brief.  Appellant's position could not be obtained at the time of filing and amici thus move for leave to file pursuant to Federal Rule of Appellate Procedure 29(a)(2), (3).

## FED. R. APP. P. 29(a)(4)(E) STATEMENT

No party's counsel authored any part of this brief.  No person other than amicus or its counsel contributed money intended to fund the brief's preparation or submission.

<u>**SUMMARY OF ARGUMENT**</u>

The press plays an essential role in ensuring the public is informed about the activities of its government. *See, e.g.*, *Mills v. Alabama*, 384 U.S. 214, 219 (1966) ("The Constitution specifically selected the press . . . to play an important role in the discussion of public affairs."); *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 573 (1980). And it remains a "basic assumption of our political system that the press will often serve as an important restraint on government." *Minneapolis Star & Trib. Co. v. Minn. Comm'r of Revenue*, 460 U.S. 575, 585 (1983). Yet, notwithstanding its laudable aim, West Virginia's Daniel's Law, W. Va. Code § 5A-8-24 ("Daniel's Law"), could, if upheld, be used to interfere with that role by prohibiting journalists from disclosing, redisclosing, or "otherwise mak[ing] available" the home address or certain other information of covered public officials, past and present, *id.* § 5A-8-24(e), even under circumstances where such information is central to accountability reporting in the public interest.

Were West Virginia's law allowed to come into effect, certain public interest reporting would be much more difficult, if not impossible. Not only would journalists face potential civil liability for publishing certain identifying information, even when necessary for a particular story—potentially chilling publication—but the threat of civil penalties would make it difficult for

journalists to even access information that is critical for these stories. This is a significant danger in a constitutional system that relies on the ability of the press to make editorial decisions without interference from public officials, who may face the temptation to use laws like the statute being challenged here in efforts to suppress news they perceive as unfavorable.

In striking down Daniel's Law as unconstitutional, the District Court understood that the Constitution requires courts to strictly scrutinize content-based restrictions on speech that do not fall within a historically unprotected category under the First Amendment, which the information covered by the statute plainly does not. *See United States v. Stevens*, 559 U.S. 460, 472 (2010). The District Court correctly determined that Daniel's Law's blanket restriction on the disclosure of certain information is simply too limiting and, while the government interest being served is legitimate, the measure is far from the least restrictive means of serving that interest. Occasionally information covered by Daniel's Law is in fact necessary for reporting on newsworthy events. And constitutional protections for publication in those instances reflect the long-standing governing principle in this country that the press must be free to provide the electorate the information it needs to hold public officials accountable. However well-intentioned the present statute, that principle must invalidate it.

Amici urge this Court to affirm the District Court's dismissal of Plaintiff-Appellant's complaint.

## ARGUMENT

**I.  The First Amendment protects the press's editorial autonomy and the ability of journalists to decide when information is in the public interest.**

It is not the province of legislatures or courts to determine what truthful information the public is entitled to know; nor may they breach that "virtually insurmountable barrier" that "the First Amendment erects" between government and media to engage in "tampering, in advance of publication, with news and editorial content." *Miami Herald Publ'g Co. v. Tornillo*, 418 U.S. 241, 259 (1974).  Daniel's Law makes such a breach.  By prohibiting journalists from "disclos[ing], redisclos[ing], or otherwise mak[ing] available" information such as the home address or telephone number of a range of active and former public officials covered by the statute, *id.* § 5A-8-24(e), Daniel's Law would, if upheld, interfere with the careful balancing that news organizations already take upon themselves when gathering and reporting the news.[1]

---

[1]  Pursuant to Daniel's Law, private individuals and entities violate the law when disclosure without permission occurs "under circumstances in which a reasonable person would believe that providing such information would expose another to harassment or risk of harm to life or property."  W. Va. Code § 5A-8-24(e).  But to be clear, this is not a scienter requirement.  That is, it does not require the government to establish that the journalist actually intended to disclose

The "choice of material" in a news story "constitute[s] the exercise of editorial control and judgment." *Tornillo*, 418 U.S. at 258. The Supreme Court has emphasized that the editorial autonomy of the news media is an indispensible feature of maintaining an independent press, which, in turn, is critical to our system of self-government. *Id*. at 259 (describing the country as having "learned . . . from . . . the unhappy experiences of other nations where government has been allowed to meddle in the internal editorial affairs of newspapers"). Thus, "[r]egardless of how beneficent-sounding the purposes of controlling the press might be," and even with respect to sensitive topics, the Supreme Court has consistently been "intensely skeptical about those measures that would allow government to insinuate itself into the editorial rooms of this Nation's press." *Id.*

To be sure, newsrooms often *choose* to withhold information if, in their independent judgment, the public interest would be best served by doing so. *See, e.g.*, John Lynch, *WV State Police Investigation: 72 New Lawsuits Allege Sexual Misconduct, List Whistleblower as Defendant*, WBOY (Feb. 27, 2024), bit.ly/47iAWN9 (not identifying information about victims that may

_____

covered information (general intent) or to cause harassment or risk to life or property (specific intent). Clear intent standards are essential to ensure that statutes like this one cannot sweep in honest mistakes, especially in the context of, say, breaking news.

have appeared in filings); Janelle Griffith, *Garth Brooks Names His Rape Accuser and Says He's 'Victim of a Shakedown,'* NBC News (Oct. 9, 2024), bit.ly/4b7vm1j (declining to name alleged victims pursuant to editorial policy); Caity Coyne, *West Virginia Delegate Denies Running Instagram Account that Made Antisemitic Remark*, West Virginia Watch (Jun. 24, 2025), https://tinyurl.com/ycxbw5yr (not providing full or partial phone number associated with social media account); Margie Mason & Robin McDowell, *Prison Work Assignments Used to Lure and Rape Female Inmates. Guards Sometimes Walk Free*, Associated Press (Oct. 31, 2024), bit.ly/40S5D89 (noting editorial policy of not naming victims unless they choose to speak on the record); Courtney Hessler, *Jury Finds Hardin Guilty of One Rape, Not Guilty on Other Charges*, The Herald-Dispatch (Aug. 17, 2020), bit.ly/4aXQMxC (same); *see also* David E. Sanger, *Leaning on Journalists and Targeting Sources, for 50 Years*, N.Y. Times (June 9, 2021), https://perma.cc/4HBF-72W4 (discussing how reporters and editors "think hard about the human consequences of [publication] decisions" in the national security context). But newsrooms already effectively navigate those real world considerations, and under the First Amendment, they remain ethical questions for journalists, not a predicate for censorship by legislatures, governors, or courts. *See Columbia Broad. Sys., Inc. v. Democratic Nat't*

*Comm.*, 412 U.S. 94, 124 (1973) ("For better or worse, editing is what editors are for; and editing is selection and choice of material"). Daniel's Law's imposition of potential liability on a journalist or news organization for publishing lawfully obtained, truthful information impermissibly interferes with the constitutional protections for "selection and choice of material." *Id.*

Many examples of public interest reporting, reliant on the kind of information covered by a Daniel's Law like statute, exist. Take just address information. Land records were vital to reporting on allegations of misconduct by a Michigan Supreme Court Justice in 2012. At that time, WXYZ-TV, a local ABC affiliate, reported on several questionable real estate transactions made by Justice Diane Hathaway. Ross Jones, *Did a Michigan Supreme Court Justice Play a Shell Game to Get Out from Her Underwater Home?*, WXYZ-TV (May 9, 2012), https://perma.cc/JT4W-6BJR.[2] The investigation relied on public records which showed that Justice Hathaway was financially secure and owned four homes in Michigan and Florida. *Id.* Yet she was permitted to engage in a short sale—a practice where banks allow homeowners to sell their home at a loss to avoid foreclosure only after they have proven significant financial hardship. *Id.*

---

[2] *See also* Associated Press, *Michigan Justice on Hot Seat Over House Transfers*, Mich. Live (May 11, 2012), https://perma.cc/CM6D-J4UJ.

The initial news report described Justice Hathaway's private residences in detail, including the names of the neighborhoods and streets where those houses were located. *Id.* That information was used to show how the properties had been shuffled between members of her family, allowing her to avoid hundreds of thousands of dollars in mortgage debt. *Id.* Justice Hathaway eventually pled guilty to bank fraud and was sentenced to a year in prison. Associated Press, *Michigan Supreme Court Justice Diane Hathaway Charged With Fraud*, Mich. Live (Jan. 19, 2013), https://perma.cc/ZVF6-KSXU; Press Release, U.S. Department of Justice, Former Michigan Supreme Court Justice Diane Marie Hathaway Sentenced On Bank Fraud Charge (May 28, 2013), https://perma.cc/W9R9-ENAN. If a version of West Virginia's Daniel's Law statute had existed in Michigan at the time, WXYZ-TV's reporting might not have been possible—or at least would have been incomplete—and the people of Michigan may have been denied important information about a member of their highest court engaging in fraud.

More recently, a *ProPublica* investigation found that an undisclosed real estate transaction between Supreme Court Justice Clarence Thomas and a prominent political donor may have violated a federal disclosure law. Justin Elliott, et al., *Billionaire Harlan Crow Bought Property from Clarence Thomas. The Justice Didn't Disclose the Deal*, ProPublica (Apr. 13, 2023),

https://perma.cc/R2VX-5VMD.  *ProPublica* relied upon financial records, including a tax document and deed listing the address of Justice Thomas' property, that confirmed that a billionaire donor's company purchased property co-owned by Justice Thomas.  *Id.*  Later that year, the Supreme Court adopted its first code of conduct.  *See* Jess Bravin, *Supreme Court Issues Code of Conduct*, Wall St. J. (Nov. 13, 2023), https://tinyurl.com/mr3ccxp7.

And, in Millbrae, California, police chief Eamonn Allen appeared to be commuting over 600 miles from Idaho to work.  *See* Dan Noyes, *Exclusive: Millbrae Police Chief Facing Questions for Allegedly Commuting to Work from Idaho*, ABC7 News (Oct. 27, 2025), https://perma.cc/VL2X-PFGR.  This suspicion was confirmed by property records.  *Id.*  Former San Francisco Police Department Commander Richard Corriea emphasized why reporting on the matter was important and in the public interest, as a chief who is "not able to return to work on short notice in the event of an emergency is ridiculous." *Id.*  Further investigation by the media revealed that there were "six sergeants . . . who live[d] out of state—in Idaho, Nevada, Texas and Tennessee.  Two of them work[ed] on the bomb squad where they made almost $600,000 in pay and benefits last year."  *Id.* (relaying commentators' concerns that these officers were "supposed to respond to a bomb threat within one hour—no way that's happening if they're in Tennessee").

These are just a few examples of important journalism that relied on reporters' ability to obtain and publish public information, including in some cases land records and home addresses, of government officials. *See also, e.g.*, Brian Slodysko, *Texas Attorney General Ken Paxton, a Senate Hopeful, Claimed 3 Homes as his Primary Residence*, A.P. (July 24, 2025), bit.ly/3YZwlLm (making use of land records to report on mortgages signed by Texas Attorney General Ken Paxton that contained inaccurate statements declaring that three homes were each Paxton's primary residence); Jonah Bromwich et al., *In the Eye of a Political Storm, a Tiny Yellow House in Norfolk, Va*, N.Y. Times (Oct. 11, 2025), https://tinyurl.com/4nxkrzf9; Daniel Boguslaw, *Samuel Alito's Wife Leased Land To An Oil and Gas Firm While The Justice Fought The EPA*, The Intercept (June 26, 2023), bit.ly/4sZbsh1(reporting on lease agreements reflecting that Supreme Court Justice Alito's wife received revenue from oil and gas extracted from a plot of land in Oklahoma and raising questions about Alito's consideration of cases involving oil and gas leases and clean water and air statutes); Chris Prentice et al., *Fed Governor Cook Declared Her Atlanta Property as "Vacation Home," Documents Show*, Reuters (Sept. 13, 2025), https://tinyurl.com/bddsvp5v (reporting on mortgage application in connection with secondary home and allegation of fraud); Jessica Parks, *Judge Berry, Ordered to Pay $180,000 in*

*Damages, is Retiring*, Phila. Inquirer (Sept. 28, 2012), https://perma.cc/F4HE-GEE8 (relying on land records to report that a judge owned a "string of derelict properties" and had been illegally running a real estate business from his judicial chambers); Glenn Kessler, *Tommy Tuberville: Florida's Third Senator?*, Wash. Post (Aug. 10, 2023), bit.ly/45uyKBm (replying on property records and home addresses of Senator to report on possible questions concerning his legal qualifications for office); John Dougherty, *Sheriff Joe's Real Estate Game*, Phx. New Times (July 1, 2004), bit.ly/4qG2XWy (using the addresses of Sheriff Joe Arpaio's properties, including his home address, as part of an investigation into Arpaio's real estate holdings, which raised questions about the source of the funds for Arpaio's numerous real estate purchases).

These examples illustrate that some accountability reporting requires access to information covered by Daniel's Law and the discretion to select what details are published. And when such a statute prohibits the publication of newsworthy information obtained through lawful means under threat of civil penalty, thereby removing journalists' editorial discretion, the public ultimately suffers. *See In re Murphy-Brown, LLC*, 907 F.3d 788, 800 (4th Cir. 2018) ("[L]egitimate news gathering activities . . . underlie the proper functioning of the First Amendment."); *People for the Ethical Treatment of*

*Animals, Inc. v. N.C. Farm Bureau Fed'n, Inc.*, 60 F.4th 815, 828 (4th Cir. 2023) (invalidating statute that "burden[ed] newsgathering and publishing activities").

What is more, the mere specter of liability under Daniel's Law could broadly chill the exercise of editorial decision-making. The Supreme Court's decision in *Daily Mail* neatly illustrates this point. There, the *Charleston Daily Mail*'s first article about a school shooting did not refer to an alleged attacker by name for fear of statutory liability, even though reporters had learned that information by speaking with witnesses and the police. *See Smith v. Daily Mail Publ'g Co.*, 443 U.S. 97, 99 (1979). As the Supreme Court noted, "[t]he editorial decision to omit the name was made *because of* the statutory prohibition against publication." *Id.* (emphasis added). The threat of criminal liability under that statute directly influenced the information the public received about a newsworthy public safety issue by pressuring the news organization into self-censorship. If upheld, Daniel's Law could threaten the same. It would permit the government to intrude on the press's central role as editor, assuming that position for itself, and would limit the store of information available to the public.

If the District Court's judgment is reversed, and Daniel's Law is held to withstand constitutional scrutiny, reporting in the public interest will be much

more difficult in the limited circumstances that require the publication of certain identifying information to fully hold public officials accountable.

**II.     Daniel's Law, which would suppress truthful facts on matters of public concern and create traps for the unwary, could chill news reporting and cannot survive constitutional scrutiny.**

Under well-settled jurisprudence, if a journalist lawfully obtains truthful information about a matter of public significance, state officials may not constitutionally punish publication of that information, absent a need to further a state interest of the highest order.  *See Daily Mail*, 443 U.S. at 103; *Fla. Star v. B.J.F.*, 491 U.S. 524, 533 (1989).  But that is exactly what West Virginia's Daniel's Law statute would do.  While the District Court did not apply *Daily Mail*, *Florida Star*, and their progeny to reach its conclusion that the statute fails the tailoring requirement under strict scrutiny, those cases squarely apply here and provide a separate and additional basis for affirming the judgment below.[3]

---

[3]     The District Court declined to rely on the *Daily Mail* and *Florida Star* line of cases, in part because those cases involved newspapers publishing the names of a juvenile offender and rape victim, respectively, while Daniel's Law "does not focus on newspapers."  Mem. Op. at 23–24.  As explained herein, however, Daniel's Law would directly affect members of the press and their ability to keep the public informed, and amici submit that the *Daily Mail* principle provides a separate and independent basis for affirming the judgment of the District Court.  And, as the District Court correctly recognized, if Daniel's Law is analyzed as a content-based restriction on speech, as it should be, the *Daily Mail/Florida Star* cases "only reinforce the conclusion that" a "highly speech protective" strict scrutiny-level standard applies.  *Id.* at 24.

First, there is no question that the public interest is served by disclosure of the kind implicated by Daniel's Law in an array of circumstances. The dissemination of factual personal information about public officials can, under particular circumstances, further government accountability by "aiding in achieving service of process, researching criminal history of officers, organizing lawful pickets, and other peaceful and lawful forms of civic involvement that publicize the issue." *Brayshaw v. City of Tallahassee*, 709 F. Supp. 2d 1244, 1249 (N.D. Fla. 2010); *accord Sheehan v. Gregoire*, 272 F. Supp. 2d 1135, 1139 n.2 (W.D. Wash. 2003) (finding that publicly-available personal identifying information regarding law enforcement officers can pertain to a subject of legitimate public interest); *see generally Ostergren v. Cuccinelli*, 615 F.3d 263, 276 (4th Cir. 2010) (observing that a "public benefit is performed by the reporting of the true contents of the records by the media." (quoting *Cox Broad. Corp. v. Cohn,* 420 U.S. 469, 495 (1975)).

Appellant argues that *Florida Star* and *Daily Mail* exempt from strict scrutiny privacy-related statutes and thus support the constitutionality of West Virginia's statute. Appellant's Br. at 9, 10. But this reading misunderstands these decisions, which are press protective rather than press restrictive. *See* Mem. Op. at 22–28. Far from undermining the First Amendment claim, *Florida Star* bolsters it. The Supreme Court in *Florida Star* roundly affirmed the holding of *Daily Mail* that

newspapers may be punished for publishing lawfully obtained truthful information on a matter of public concern, "*if at all*, only when narrowly tailored to a state interest of the highest order." *Fla. Star*, 491 U.S. at at 541 (emphasis added).

In *Daily Mail*, although as noted, *supra*, the *Charleston Daily Mail* did not publish the name of the assailant in its initial article, several other media outlets, which had obtained the shooter's identity by speaking with witnesses and police at the scene, did include it in their reporting. *Daily Mail*, 443 U.S. at 99. These outlets were then indicted for violating a state statute that prohibited knowingly publishing the name of a minor involved in a juvenile proceeding. *Id.* at 100. The West Virginia Supreme Court dismissed the indictments on the grounds that the statute violated the First Amendment and the U.S. Supreme Court affirmed, holding that the state's interest in protecting the minor's identity was insufficient to justify subjecting the press to criminal liability. *Id.* at 104.

The Fourth Circuit has consistently relied on *Daily Mail* in decisions bolstering the public's right to publish truthful information about matters of public concern. *See, e.g.*, *Soderberg v. Carrion.*, 999 F.3d 962, 967–70 (4th Cir. 2021) (applying *Daily Mail* to reverse district court's decision to apply intermediate scrutiny to content-neutral statute criminalizing the broadcasting of official court recordings of state criminal proceedings and remanding for

strict scrutiny to be applied); *Ostergren*, 615 F.3d at 271 (same, to hold a

Virginia statute prohibiting communication of other individuals' social

security numbers unconstitutional as applied to plaintiff who disclosed public

records containing social security numbers to alert the public to the fact that

the state was making such sensitive information publicly available). Indeed,

this Court has previously characterized review under *Daily Mail* and *Florida

Star* as synonymous with strict scrutiny. *Soderberg*, 999 F.3d at 969

("[A]lthough *Daily Mail* did not refer to its standard as 'strict scrutiny,' that

term has since been used to describe the standard.").[4]

Moreover, while West Virginia's interest in "enhanc[ing] the safety and

security" of law enforcement and judicial officers and their families, W. Va.

Code § 5A-8-24(b), is of course a compelling one, Daniel's Law must fail strict

scrutiny because it is not narrowly tailored, as the First Amendment requires, to

meet that goal. As the District Court found, "Section E of West Virginia's statute

might be the <u>most</u> restrictive of the available means for achieving its compelling

interest." Mem. Op. at 33 (emphasis in original). Most notably, West Virginia's

version of Daniel's Law does not include a notice requirement, which would

---

[4] The District Court here distinguished the decision of a New Jersey court, which failed to apply strict scrutiny to that state's Daniel's Law, holding that Fourth Circuit precedent requires application of the heightened standard. Mem. Op. at 23 (citing *Atlas Data Priv. Corp. v. We Inform, LLC*, 758 F. Supp. 3d 322, 335–36 (D.N.J. 2024)).

require a public official or other plaintiff to provide notice to the defendant that they believe Daniel's Law applies and want the information removed from where it has been published or displayed. *Id.* Instead, the West Virginia law "places the burden on the would-be speaker to overcome the impediment to speech, rather than placing the burden on those who would like to advance a countervailing interest in safety." *Id*. at 37. Without a notice requirement, journalists, among other speakers, may be inclined to self-censor out of fear of potential liability. In fact, the Supreme Court of New Jersey held that its state's version of Daniel's Law was narrowly tailored *because* notice is required before any liability can be imposed under its statutory framework. *See Kratovil v. City of New Brunswick*, 336 A. 3d 201, 217 (N.J. 2025). West Virginia's Daniel's Law's, on the other hand, operates as a "trap for the unwary," *id.*, with the potential to ensnare journalists disclosing truthful, factual information about public officials, even under circumstances in which disclosure serves the public by enhancing government accountability.

Daniel's Law also lacks an appropriate scienter requirement for private individuals and entities, which forces journalists and other private actors to conduct and resolve burdensome inspections of their speech before disseminating information prohibited under the statute. Mem. Op. at 40–41. This is a nearly impossible task given that the statute covers a variety of currently and previously employed public officials, in- and out-of-state. The lack of a knowledge

requirement is especially problematic given that the statutory framework does, in fact, contain a knowledge requirement for government actors. *See* W. Va. Code § 5A-8-24(d) (providing that "a state or local government agency shall not *knowingly* disclose" protected information (emphasis added)). This statutory distinction requires private actors to perform rigorous reviews before publishing categories of information, while not putting this same burden on government actors.

Without a notice or knowledge requirement, Daniel's Law would make compliance vis-à-vis the simplest of news reporting remarkably difficult. For instance, if a reporter were writing a breaking news story about "John Smith" committing a crime at his residence, and wanted to inform the public about the address where the incident reportedly occurred, to avoid potential liability they would first have to confirm that this "John Smith," as opposed to the substantial number of other individuals with the same name, had never been employed as an in- or out-of-state judicial officer, prosecutor, federal or state public defender, federal or state assistant public defender, or law enforcement officer. "John Smith," on the other hand, would not be legally obligated to notify the journalist that he is covered by Daniel's Law before filing a lawsuit. The onus would thus be on the reporter to determine the statute's application. The asymmetry between these scienter requirements likewise demonstrates how the legislature's failure to to tailor the statute to the interest asserted by the state dooms it under the West

Virginia Constitution and the First Amendment. Were the law allowed to enter force, the statute could deprive journalists of information they need to do their jobs, lead journalists to self-censor, and give public officials a legal cudgel to suppress accountability reporting perceived as critical or embarrassing.

## **CONCLUSION**

For the foregoing reasons, amici respectfully urge this Court to affirm the judgment of the District Court.

Dated: March 10, 2026

Respectfully submitted,

/s/ Mara Gassmann

Mara Gassmann
   *Counsel of Record*
Lisa Zycherman
Gabriel Rottman*
Matthew Singer*
THE REPORTERS COMMITTEE FOR
   FREEDOM OF THE PRESS
1156 15th St. NW, Suite 1250
Washington, D.C. 20005
(202) 795-9300

Ian Kalish, Esq.*
UNIVERSITY OF VIRGINIA LAW SCHOOL
   FIRST AMENDMENT CLINIC[5]
580 Massie Road
Charlottesville, VA 22903
(202) 795-9316

---

[5] This amicus brief does not represent the views of the University of Virginia School of Law, which does not as an institution take a position in this litigation.

*\* Of counsel*

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing brief of amici curiae complies with:

1) the type-volume limitation of Fed. R. App. P. 29(a)(5) because it contains 4,321 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f), as calculated by the word-processing system used to prepare the brief; and

2) the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Office Word in 14-point Times New Roman.

/s/ Mara Gassmann
Mara Gassmann
*Counsel of Record*
THE REPORTERS COMMITTEE FOR FREEDOM OF THE PRESS

Dated:     March 10, 2026
          Washington, DC

## ADDENDUM: STATEMENTS OF INTEREST OF INDIVIDUAL AMICI CURIAE

The Associated Press ("AP") is a news cooperative organized under the Not-for-Profit Corporation Law of New York.  The AP's members and subscribers include the nation's newspapers, magazines, broadcasters, cable news services and Internet content providers.  The AP operates from 280 locations in more than 100 countries.  On any given day, AP's content can reach more than half of the world's population.

The Center for Investigative Reporting, Inc. is the nation's oldest nonprofit investigative newsroom in the country that runs the brands Mother Jones, Reveal, and CIR Studios. Mother Jones is a reader-supported news magazine and website known for ground-breaking investigative and in-depth journalism on issues of national and global significance. Reveal produces investigative journalism for the Reveal national public radio show and podcast, and CIR Studios produces feature length documentaries distributed on Netflix, Hulu and other streaming channels. Reveal often works in collaboration with other newsrooms across the country.

First Amendment Coalition ("FAC") is a nonprofit public interest organization dedicated to defending free speech, free press and open government rights in order to make government, at all levels, more accountable to the people. The Coalition's mission assumes that government transparency and an informed electorate are essential to a self-governing democracy. FAC advances this purpose

by working to improve governmental compliance with state and federal open government laws. FAC's activities include free legal consultations on access to public records and First Amendment issues, educational programs, legislative oversight of California bills affecting access to government records and free speech, and public advocacy, including extensive litigation and appellate work. FAC's members are news organizations, law firms, libraries, civic organizations, academics, freelance journalists, bloggers, activists, and ordinary citizens.

The Intercept Media, Inc. is a non-profit digital media venture committed to rigorous, adversarial journalism in the public interest.

The International Documentary Association ("IDA") is dedicated to building and serving the needs of a thriving documentary culture. Through its programs, the IDA provides resources, creates community, and defends rights and freedoms for documentary artists, activists, and journalists.

The Media Institute is a nonprofit foundation specializing in communications policy issues founded in 1979. The Media Institute exists to foster three goals: freedom of speech, a competitive media and communications industry, and excellence in journalism. Its program agenda encompasses all sectors of the media, from print and broadcast outlets to cable, satellite, and online services.

The National Press Photographers Association ("NPPA") is a 501(c)(6) non-profit organization dedicated to the advancement of visual journalism in its creation, editing and distribution. NPPA's members include television and still photographers, editors, students and representatives of businesses that serve the visual journalism industry. Since its founding in 1946, the NPPA has vigorously promoted the constitutional rights of journalists as well as freedom of the press in all its forms, especially as it relates to visual journalism. The submission of this brief was duly authorized by Mickey H. Osterreicher, its General Counsel.

National Public Radio, Inc. ("NPR") is a non-profit multimedia organization and the leading provider of non-commercial news, information, and entertainment programming to the American public. NPR's fact-based, independent journalism helps the public stay on top of breaking news, follow the most critical stories of the day, and track complex issues over the long term. NPR reaches approximately 60 million people each week on broadcast radio, podcasts, NPR apps, NPR.org, and YouTube video content. NPR distributes its radio broadcasts through more than 1,000 non-commercial, independently operated radio stations, licensed to more than 260 NPR members and numerous other NPR-affiliated entities.

The New York Times Company is the publisher of The New York Times and operates the news website nytimes.com.

The News/Media Alliance represents over 2,200 diverse publishers in the U.S. and internationally, ranging from the largest news and magazine publishers to hyperlocal newspapers, and from digital-only outlets to papers who have printed news since before the Constitutional Convention. Its membership creates quality journalistic content that accounts for nearly 90 percent of daily newspaper circulation in the U.S., over 500 individual magazine brands, and dozens of digital-only properties. The Alliance diligently advocates for newspapers, magazine, and digital publishers, on issues that affect them today.

Pro Publica, Inc. ("ProPublica") is an independent, nonprofit newsroom that produces investigative journalism in the public interest. It has won six Pulitzer Prizes, most recently a 2020 prize for national reporting, the 2019 prize for feature writing, and the 2017 gold medal for public service. ProPublica is supported almost entirely by philanthropy and offers its articles for republication, both through its website, propublica.org, and directly to leading news organizations selected for maximum impact. ProPublica has extensive regional and local operations, including ProPublica Illinois, which began publishing in late 2017 and was honored (along with the Chicago Tribune) as a finalist for the 2018 Pulitzer Prize for Local Reporting, an initiative with the Texas Tribune, which launched in March 2020, and a series of Local Reporting Network partnerships.

Radio Television Digital News Association ("RTDNA") is the world's largest and only professional organization devoted exclusively to electronic journalism. RTDNA is made up of news directors, news associates, educators and students in radio, television, cable and electronic media in more than 30 countries. RTDNA is committed to encouraging excellence in the electronic journalism industry and upholding First Amendment freedoms.

The Seattle Times Company, locally owned since 1896, publishes the daily newspaper The Seattle Times, together with the Yakima Herald-Republic and Walla Walla Union-Bulletin, all in Washington state.

The Society of Environmental Journalists is the only North-American membership association of professional journalists dedicated to more and better coverage of environment-related issues.

Student Press Law Center ("SPLC") is a nonprofit, nonpartisan organization which, since 1974, has been the nation's only legal assistance agency devoted exclusively to educating high school and college journalists about the rights and responsibilities embodied in the First Amendment to the Constitution of the United States. SPLC provides free legal assistance, information and educational materials for student journalists on a variety of legal topics.

The Tully Center for Free Speech began in Fall, 2006, at Syracuse University's S.I. Newhouse School of Public Communications, one of the nation's premier schools of mass communications.

## CERTIFICATE OF SERVICE

I hereby certify that I have filed the foregoing brief of proposed amici curiae electronically with the Clerk of the Court for the United States Court of Appeals for the Fourth Circuit using the appellate CM/ECF system on March 10, 2026.

I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

/s/ Mara Gassmann

Mara Gassmann
*Counsel of Record*
THE REPORTERS COMMITTEE FOR FREEDOM OF THE PRESS